State v. Universal Underwriters Ins. Co., No. 539-9-98 Wncv (Teachout, J., Aug. 20, 2003)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT
## WASHINGTON COUNTY, SS.

| | | |
|---|---|---|
| **STATE OF VERMONT** | ) | |
| | ) | **Washington Superior Court** |
| v. | ) | **Docket No. 539-9-98 Wncv** |
| | ) | |
| **UNIVERSAL UNDERWRITERS INS. CO.** | ) | |

## FINDINGS AND CONCLUSIONS
### Part One (Liability) of Bifurcated Final Hearing on the Merits

This matter came before the court on May 15 and 16, 2003 for a final evidentiary hearing on the merits on Defendant's liability to provide insurance coverage. Pursuant to Order of March 24, 2003, the damages portion of the final hearing is postponed and will be consolidated with the damages portion (if any) of State v. Peerless, Docket No. 681-12-01 Wncv. Plaintiff is represented by William E. Griffin, Esq. and Mark J. DiStefano, Esq. Defendant is represented by James H. Kallianis, Jr., Esq. and Antonin I..Z. Robbason, Esq. Following the hearing, the parties filed proposed findings of fact and several memoranda of law.

In this and the related State v. Peerless case, the State seeks reimbursement for funds spent by the State from the Petroleum Cleanup Fund to clean up petroleum contamination in East Clarendon, Vermont. The State alleges that the petroleum at a single site came from facilities on two neighboring properties, one an auto dealership operated by C.H. Jorgensen, A Corporation, and the other a general store. In this case, the State seeks reimbursement in relation to the Jorgensen property, and in State v. Peerless, the State seeks reimbursement in relation to the general store property. In this case, the State has sued the insurer directly, and claims that insurance policies issued in relation to the Jorgensen property provide coverage, whereas the insurer, Universal Underwriters Insurance Company (Universal), claims that no coverage is available for a variety of reasons discussed below.

1

**Findings of Fact**

The factual history concerning discovery of contamination at the site and remediation efforts is set forth below. The issues between the parties involve the specific provisions of insurance policies and their application to the facts.

In June of 1990, the State Agency of Natural Resources received a report of contaminated wells in East Clarendon. Its Department of Environmental Conservation (DEC) undertook an inspection and confirmed contamination by petroleum of drinking water wells in the area. DEC personnel suspected that the petroleum releases were coming from one or both of two adjoining properties, one owned by Clarence and Marilyn Jorgensen on which a Honda dealership was operated, and the other owned by Judith Webster on which the East Clarendon General Store was operated. It determined that there was one underground storage tank on the Jorgensen property and two on the Webster property. On July 9, 1990, it sent to C. H. Jorgensen, Jr. and Judith Webster letters identifying them as potentially responsible parties, and asking them to investigate and respond. DEC informed them that if they did not comply, it would perform the work and seek reimbursement from them. On July 19, 1990, a letter was sent by Clarence Jorgensen on behalf of C.H. Jorgensen, A Corporation, stating that the corporation declined to voluntarily perform the mitigation and site assessment efforts that DEC had identified.

Beginning in the fall of 1990, DEC undertook the investigation and cleanup, and employed contractors for much of the work. On May 1, 1991, Robert Haslam, who was the DEC project manager, conducted an inspection at the Jorgensen property. With the help of contract workers, he removed the asphalt and soil over the 1000 gallon underground storage tank, exposing the upper 6" of the tank. He did not find a leak. He examined the space between the double walls of the underground storage tank, and found no petroleum, which indicated that there was no leak between the inner and outer walls of the tank. There was no leak in the underground piping that was exposed by the excavation. Another test conducted through the fill port revealed that the tank itself was sound.

He then investigated the dispenser, which was located above ground at one end of the tank, and partially off to the side of it. The dispenser sat on top of a 4" thick concrete pad which was resting on the ground. A pipe ran from the top of the underground tank straight up to a union with another pipe (still underground) that ran horizontally to a point below the dispenser, where it connected (still underground) to another pipe that ran vertically straight up through a hole in the concrete pad to the dispenser above. Mr. Haslam first removed the soil to a point as close as possible to the concrete pad, exposing the vertical pipe leading out of the tank and a portion of the horizontal pipe, and found no leak. He did not remove the soil under the concrete pad, and therefore did not expose a portion of the horizontal pipe or the vertical pipe that emerged from the ground through the concrete pad into the above ground dispenser.

Mr. Haslam then went to the top of the dispenser itself, which was above ground, sitting on the concrete pad, and opened the cover plate. When he looked down into the dispenser, he saw gas leaking at a union of pipes located approximately 8-10" above the top of the concrete pad. The vertical pipe coming from below ground and through the concrete pad was joined to

2

another pipe at this location, approximately 12" or more above the ground. Gas was dripping off the pipe union and running down through the hole in the concrete pad into the ground. The drip was immediately observable and steady. He then collected a sample from the nearest monitoring well in the area with a bailer, and discovered a 26" thickness of pure gasoline.

Charles Schwer was the Chief of the Sites Section of DEC, and was the person who authorized expenditures from the Petroleum Cleanup Fund (PCF). The PCF was established by statute for the purpose of providing funds for the cleanup of releases from underground storage tanks and compensating third parties for damages from releases. At the time pertinent to this case, the PCF could only be used in relation to releases from underground storage tanks. (In 1998, eligibility was expanded to include above ground storage tanks.) Mr. Schwer was not clear whether the pipe union where the leak was discovered should be treated as part of an underground storage tank or not, since it was located above ground in a dispenser attached to an underground storage tank. There is a definition of underground storage tank in the PCF "Procedures" guidelines, but it did not help him determine eligibility for use of PCF funds. He authorized the expenditures from the PCF nonetheless, in order to avoid delay in dealing with a serious level of contamination at the site.

10 V.S.A. Chapter 59 is entitled "Underground Liquid Storage Tanks." It includes two statutory sections pertinent to this case, each located in a different Subchapter. 10 V.S.A. §1921 et seq. authorizes standards and criteria for regulating underground storage tanks for the purpose of *preventing* ground and surface water contamination. 10 V.S.A. §1941 establishes the PCF for the purpose of *cleaning up* and restoring soils contaminated by releases from underground storage tanks. ANR has issued regulations pertinent to its preventative regulatory function with respect to underground storage tanks. These regulations are administered by a different department in the agency than the Sites Section, which is the one that is responsible for cleanup of sites using PCF funds. With respect to the regulation of underground storage tanks, both the statute and the regulations define "underground storage tank" as follows:

> any one or combination of tanks, including underground pipes connected to it or them, which is or has been used to contain an accumulation of regulated substances, and the volume of which, including the volume of the underground pipes connected to it or them, is 10 percent or more beneath the surface of the ground.

10 V.S.A. §1922(10); Underground Liquid Storage Tank Regulations 8-201(31). The regulations define "facility" or "storage facility" as "one or more underground storage tanks, including any associated pipelines, fixtures, or other equipment." UST Regs. 8-201(11).

Between October 15, 1990 and May 21, 2002, ANR paid for investigation and cleanup expenses at the Jorgensen site from the PCF. The statute authorizes PCF expenditures for remediation expenses as well as for property damage to third parties, and both types of expenditures were made. For remediation, $900,000-1,000,000 was spent, and approximately $260,000 was spent for damage to third parties, primarily related to private water supplies. The

cleanup continued, and in May of 1997, the cleanup had progressed sufficiently that the remedial system was decommissioned. The equivalent of more than 1000 gallons of petroleum product was recovered from the site. Ongoing monitoring will continue for approximately 10 more years.

The Jorgensen property is owned by Clarence and Marilyn Jorgensen. A corporation entitled C. H. Jorgensen, A Corporation, was the entity that operated an auto dealership on the property. The corporation had purchased general commercial general liability policies from Universal every year since 1982, and Mr. and Mrs. Jorgensen, as well as the corporation, were named insureds. Prior to 1984, the State Department of Banking and Insurance (DBI) did not permit insurers to issue liability policies that excluded pollution coverage. Although Universal's standard form policy contained such an exclusion, in Vermont that exclusion was required by DBI to be deleted in order to implement compliance with the requirement that pollution coverage be included. It was provided on an "occurrence" basis.

In 1984, the insurance industry approached DBI with new proposals, and after negotiations, changes were allowed. From then on, insurers were permitted to issue standard form policies that excluded pollution coverage, but with a State Amendatory Part required in Vermont that built pollution coverage back into the policy on a "claims made," rather than an "occurrence," basis. In addition, DBI allowed insurers to negotiate with commercial insureds to exclude pollution coverage from their commercial coverage, as long as "individual risk filing" procedures were followed, which required documents clarifying the exclusion, signed by the business owner, to be filed and approved. DBI required insurers to offer these business clients the option of purchasing separate policies for pollution coverage. An individual risk filing was not needed to exclude pollution coverage from a commercial umbrella policy if a pollution liability policy on the excluded risk was purchased by the insured. The Department did not, however, permit individual risk filings or exclusion of pollution coverage with respect to personal lines of insurance.

For the policy year beginning February 1, 1990, which is the year pertinent to this case, Universal issued two separate policies in relation to the Jorgensen property, providing for different kinds of coverage as follows:

Unicover policy: This was a multiple coverage insurance policy. It covered C.H. Jorgensen, A Corporation, with garage and operations coverage in the amount of $300,000. It also covered the corporation with commercial umbrella coverage in the amount of $3,000,000. With respect to the commercial umbrella coverage, an individual rate filing to exclude pollution coverage was signed on February 1, 1990, on behalf of C.H. Jorgensen, A Corporation, by its President, C.H. Jorgensen. The corporation purchased a separate Pollution Liability policy (see below). An individual risk filing was not actually required, since a concurrent pollution liability policy was purchased on the same risk. In any event, pollution coverage was excluded from the commercial umbrella coverage. This Unicover policy also covered Mr. and Mrs. Jorgensen as named insureds with personal umbrella coverage in the amount of $1,000,000. Although exclusion (h) in the policy states that pollution coverage is excluded, the Vermont Amendatory

4

Part amends the personal umbrella coverage to remove exclusion (h): "PERSONAL UMBRELLA Coverage Part 970 is amended to remove EXCLUSION (h)." (Plaintiff's A, page 50.)

Pollution Liability policy:  This was a separate policy that provided $1,000,000 of coverage to the corporation and to Clarence H. and Marilyn Jorgensen for cleanup costs because of environmental damages caused by a pollution incident.  Under exclusion (j) of this policy, coverage was excluded for "INJURY or ENVIRONMENTAL DAMAGE eminating (sic) from any underground storage facility."  The policy does not include a definition of this term.

C.H. Jorgensen, A Corporation, made a claim against Universal with respect to the release of petroleum on the property.  On September 30, 1992, Universal wrote to the corporation that there was no coverage because of the absolute pollution exclusion under the Unicover policy, and lack of coverage in the Pollution Liability policy "for this type of loss which deals with Underground Storage Tanks."  The State filed this suit on September 30, 1998.  The State claims coverage under the Pollution Liability policy through the corporation and Mr. and Mrs. Jorgensen, and under the personal umbrella portion of the Unicover policy through Mr. and Mrs. Jorgensen.  Universal claims that with respect to the Pollution Liability policy, the exclusion for underground storage facilities bars coverage.  It further claims that there is no coverage under the Unicover policy because of the pollution exclusion, and that to the extent coverage is claimed through Mr. and Mrs. Jorgensen on the personal umbrella coverage, the "business pursuits" exclusion bars coverage.

## Conclusions of Law

1. Responsible parties.

Clarence and Marilyn Jorgensen, as owners, and C.H. Jorgensen, A Corporation, as operator, are all parties responsible for abating release of petroleum on the Jorgensen property, and for costs of investigation, removal and remedial actions incurred by the state which are necessary to protect the public health and the environment.  10 V.S.A. §6615(a).

2. Basis for liability.

The State is authorized by statute to seek reimbursement of PCF cleanup expenditures when there is insurance coverage.  10 V.S.A. §1941(f).  ANR v. U.S. Fire Ins. Co., 173 Vt. 302 (2001).

3. Pollution Liability policy.

Under the Pollution Liability policy, there is coverage for the damages and pollution cleanup expenditures incurred by the State unless the exclusion for underground storage facilities

5

applies.  Once a plaintiff has shown eligibility for insurance coverage, the defendant has the burden to prove that an exclusion applies.  Id.; see City of Burlington v. Assoc. Elec. & Gas Ins. Servs., 170 Vt. 358, 364 (2000).  Therefore, it is Universal's burden to show that the exclusion bars coverage.

Under exclusion (j) of the policy:

> This insurance does not apply to INJURY or ENVIRONMENTAL DAMAGE eminating from any underground storage facility owned by, rented, leased or in the care, custody or control of any INSURED.

There is no definition of "underground storage facility" in the policy itself, so ordinary contract principles applicable to the construction of insurance policies are the frame of reference for applying this provision to the facts of the case.  The purpose of the policy was to provide protection against the risk of pollution injury or damage, except for that "eminating (sic) from any underground storage facility," and the terms must therefore be interpreted in light of that purpose, "with limitations and exclusions strictly construed."  City of Burlington v. Glens Falls Insurance Company, 133 Vt. 423 at 424 (1975).   The effect of the exclusion should be interpreted "in accord with the reasonable expectations" of the insured.  Cooperative Fire Insurance Association of Vermont v. White Caps, Inc., 166 Vt. 355, 360 (1997).

The fundamental distinction between an underground storage facility and an above ground storage facility is whether or not it is buried in the ground.  An underground storage facility is not capable of being monitored and maintained to the same extent as a comparable above ground facility.  It makes sense that leaks from tanks buried beneath ground level represent a higher risk for insurers than those that can be more easily inspected and maintained, and that this difference reasonably justifies excluding them from a policy with a rate structure designed for above ground  facilities.  The fact that the policy uses the phrase "underground storage facilities" is consistent with the use of this distinction, since it is not only the tank itself, but also associated buried piping that is incapable of being seen and thereby represents undetectable risk.  Hence, the exclusion applies not only to the tank itself, but to its related appurtenances that are also underground.  The word "facility" accomplishes this purpose, as it makes clear that the exclusion is not limited to the tank, but anything related to it that is also buried.

The exclusion would therefore bar coverage for a release emanating from any of the pipes leading from the tank to the dispenser on the Jorgensen property, to the extent that they were in the ground. This would include the first vertical pipe leading out of the tank, the horizontal pipe still underground, and that portion of the next vertical pipe located below the concrete pad.  It does not make sense to apply the exclusion to a leak in a dispenser that is located 12" above ground at a place where it is capable of being maintained and monitored.  The leak occurred at a location clearly above ground, three pipe unions away from the tank.  The risk associated with this location is no different than the risk from a leak at a comparable place in an above ground

6

storage facility.  In applying the exclusion in accordance with the "reasonable expectations" of the insured, id., an insured would reasonably expect that environmental damage and injury emanating from a location below ground would be excluded from coverage, whereas environmental damage and injury emanating from a location above ground would not be excluded.

Universal asks the court to use the definition in the underground storage tank regulatory statute and related regulations in interpreting the meaning of the term "underground storage facilities" in the policy exclusion.  Neither exclusion (j) nor any other term of the policy includes any reference to state statutes or regulations.  Therefore, there is no indication that it was the intent of either party to incorporate such definitions into the policy to set standards for purposes of interpreting exclusion (j).

Even if these definitions are used, however, they do not help Universal meet its burden of proof.  The definition of "underground storage tank" is as follows:

> . . .any one or combination of tanks, including underground pipes connected to it or them, which is or has been used to contain an accumulation of regulated substances, and the volume of which, including the volume of the underground pipes connected to it or them, is 10 percent or more beneath the surface of the ground.

10 V.S.A. §1922(10); UST Regulations §8-201(31).  "Facility" or "storage facility" is defined by regulation as "one or more underground storage tanks, including any associated pipelines, fixtures, or other equipment."  UST Regs. 8-201(11).  Therefore, to the extent pipes related to an underground storage tank are included, they are described under the statutory definition as "underground."   It is arguable that the word "underground" in the definition of "facility" in Regulation 8-201(11) modifies all nouns in the remainder of the sentence and not just "tanks," and that the meaning of the exclusion is therefore ambiguous.  The most reasonable interpretation of the provision is that it applies to tanks, pipes, and equipment to the extent they are underground.  That is the reason that these items are subject to regulation.  The characteristic that distinguishes underground devices that contain regulated substances from above ground devices for the same purpose is that they are located beneath the ground, and are therefore unavailable for monitoring.  Regulated substances can leak out of them and go directly into the ground without detection.  They thereby represent a heightened hazard to public health and the environment, as they have the potential to cause a much greater degree of damage before the problem is discovered than do comparable devices above ground.

Universal argues that Mr. Schwer's authorization of payments from the PCF to remediate the Jorgensen release site necessarily mandates applying exclusion (j) to bar coverage, since DEC itself treated the release as coming from an underground source.  Mr. Schwer, a DEC site supervisor and not an expert in interpreting insurance policy terms, made a practical decision in 1990 concerning PCF eligibility when he could find no clear guidance and was faced with a seriously contaminated site.  This decision cannot be the basis for a legal decision construing a

private insurance agreement between Universal and its insured, a contract to which the State was never a party. It is the court's responsibility to construe the exclusion using principles of insurance policy interpretation developed in the law. Mr. Schwer's decision on PCF eligibility has very little value for that purpose, and is certainly not binding as to its effect in determining insurance coverage.

To the extent there is ambiguity in exclusion (j) at least as it relates to the facts of this case, the court resolves that ambiguity by interpreting the exclusion as inapplicable where the leak was in piping in the dispenser apparatus, above ground, three pipe unions away from the tank. This interpretation uses the clear distinction of above ground/below ground, or buried/unburied, as the standard for deciding whether piping related to an underground storage tank is excluded from a policy that is designed to exclude from coverage devices in which regulated substances are stored beneath the ground. It incorporates a principle that is sound as to risk allocation, since it is based on the essential characteristic of underground tanks: that releases can occur without detection due to the practical inability to monitor the facility for integrity, resulting in a greater degree of contamination than is likely to result from above ground tanks.

In sum, the court concludes that Universal has not sustained its burden to show that exclusion (j) bars coverage for the injury and damage resulting from the release from the pipe joint located 12" above ground within the dispenser. Therefore, there is insurance coverage under the Pollution Liability policy in the amount of $1,000,000 less retention.

4. Unicover policy.

The State's expenditures fall within coverage under the policy terms, unless a pollution exclusion applies. It is Universal's burden to show that the exclusion bars coverage. See City of Burlington v. Assoc. Elec. & Gas Ins. Servs., 170 Vt. 358, 364 (2000).

The policy is actually a collection of three policies (garage and operations; commercial umbrella, and personal umbrella) under the terms of the policy language:

> [E]ach Coverage Part is made up of its provisions, plus those of the State Amendatory Part (if any), the General Conditions, and that portion of the declarations referring to the coverage Part, including all endorsements made applicable to that Coverage Part. Each Coverage Part so constituted becomes a separate contract of insurance.

Plaintiff's Exhibit A (Unicover policy) at 13.

Universal has met its burden to show that pollution coverage was excluded from the policy as to the corporation, as there was both a separate pollution policy and an individual risk filing excluding coverage. The State does not dispute this conclusion.

8

As to the personal umbrella coverage for the insureds Mr. and Mrs. Jorgensen, however, neither of the individuals signed a consent to rate application. Universal's argument that Mr. Jorgensen's signature alone, given on behalf of the corporation, was sufficient to make the individual risk filing effective as to all insureds ignores the fundamental distinction between a signature given on behalf of a corporation and one given as an individual. Mr. Jorgensen simply did not sign in his individual capacity, and no one signed for Mrs. Jorgensen. More significantly, the individual risk filing was not authorized on personal lines of insurance, and therefore could not lawfully be effective. 8 V.S.A. §3541(a). Consequently, the State Amendatory Part that removed exclusion (h) from personal umbrella coverage applied to eliminate the pollution exclusion as to Mr. and Mrs. Jorgensen.

Universal argues that the State's original claim in this case did not specify that it was seeking coverage through Mr. and Mrs. Jorgensen on the personal umbrella coverage. It is clear from Judge Cheever's decision on the cross motions for summary judgment, entered July 24, 2002, that the State was making such a claim at that time. Discovery continued after that date, and Universal never objected to the State making such a claim in the case. Universal cannot show prejudice. This theory of the claim will be treated as if part of the original pleadings. V.R.C.P. 15(b).

Universal argues that an exclusion for "business pursuits," exclusion (i), bars coverage as to the individuals Mr. and Mrs. Jorgensen. This argument was raised for the first time in post-hearing argument. There is insufficient evidence in the record to support this defense. While facts are referred to in Universal's memo argument on this issue, those facts were not admitted into evidence, and the court is not in a position to make findings of fact on the predicate facts that would support this defense. In addition, Universal waived this defense by not raising it either at the time of declining coverage, or in its answer to the complaint in this action. Middlebrook v. Banker's Life and Casualty Co., 126 Vt. 432 (1967); Armstrong v. Hanover Ins. Co., 130 Vt. 182 (1972).

Universal has not met its burden to show that the pollution exclusion applies under the personal umbrella policy covering Mr. and Mrs. Jorgensen. Therefore, the court concludes that there is insurance coverage through the insureds Mr. and Mrs. Jorgensen under the Personal Umbrella portion of the Unicover policy in the amount of $1,000,000 less retention.

9

**Order**

For the foregoing reasons, Plaintiff has established liability as set forth above. The case will be scheduled for a hearing on damages which will be consolidated with the damages portion, if any, of State v. Peerless, Docket No. 681-12-01 Wncv.

Dated at Montpelier, Vermont this _____ day of August, 2003.

_____
Mary Miles Teachout
Superior Judge

10