936 A.2d 1291 (2007)
2007 VT 82
STATE of Vermont
v.
Christopher BONVIE.
State of Vermont
v.
Adam Gilbeau.
No. 05-560, 06-096.
Supreme Court of Vermont.
August 24, 2007.
*1292 Robert Butterfield, Caledonia County State's Attorney, St. Johnsbury, for Plaintiff-Appellant (05-560).
Stuart G. Schurr, Department of State's Attorney, Montpelier, for Plaintiff-Appellant (06-096).
David C. Sleigh of Sleigh & Williams, St. Johnsbury, for Defendant-Appellee (05-560).
William E. Kraham of Weber, Perra & Munzing, P.C., Brattleboro, for Defendant-Appellee (06-096.).
Present: REIBER, C.J., DOOLEY, JOHNSON, SKOGLUND and BURGESS, JJ.
¶ 1. DOOLEY, J.
Defendants, Christopher Bonvie and Adam Gilbeau, were separately arrested for driving under the influence (DUI). Each man received a citation for "DUI/Refusal" based on the arresting officer's determination that he had refused the test. In each defendant's license-suspension hearing, the district court disagreed, concluding that defendant had not refused, or even if he had, his subsequent request to take the test cured his initial refusal. We consolidate these substantially identical appeals by the State and affirm. We hold that subsequent, good-faith consent to take a breathalyzer test negates an earlier refusal if the consent is given within the statutory thirty-minute window to contact an attorney that 23 V.S.A. § 1202(c) provides, subject to the factors outlined in Standish v. Department of Revenue, 235 Kan. 900, 683 P.2d 1276, 1280 (1984), discussed herein.
¶ 2. The stories of the two arrests are largely the same. Defendant Bonvie, age nineteen at the time, was stopped for failing to obey a stop sign. Based on roadside observations, the arresting officer concluded that he had probable cause to believe defendant was driving under the influence of alcohol and transported him to the police station for processing. The officer *1293 read him his rights regarding the breathalyzer test, including the provision that his privilege to drive could be suspended for at least six months if he refused to take the test. At defendant's request, the officer contacted a lawyer, and when defendant's conversation with the lawyer concluded, the officer returned to the room and asked if defendant would submit to the test. Defendant responded that his lawyer told him not to answer any questions.
¶ 3. The following exchange ensued The officer: "Well, are you going to provide a sample of your breath?" Defendant Bonvie: "I guess no." The officer: "Is that a no?" Defendant: "No." The officer concluded that defendant had declined to take the test and handed him his civil-suspension paperwork. Upon looking at it, defendant asked why his license would be suspended for six months, and the officer explained it was because he had declined to take the test. At that point defendant asked if he could take the test, and the officer refused. The trial court found, and the State does not contest, that just under thirty minutes elapsed between the initial attempt to contact an attorney and defendant's request to take the test.
¶ 4. Defendant Gilbeau was approached by an officer who saw smoke and tire marks coming from his parked vehicle. The vehicle was still running, and its two right tires were lodged on the curb in front of a pub. The officer informed defendant of his rights regarding the breath test; defendant chose not to speak with an attorney. When asked if he would submit to a test, defendant said "no." When defendant saw the paperwork citing him for "DUI/Refusal," however, he told the officer that he misunderstood and explained that he thought he was being asked to agree that the breath test could be used as evidence against him in court. Although he would not agree to that, he stated that he would submit a sample of his breath for an evidentiary test. The officer refused to give him the test. Defendant testified at his civil suspension hearing that "immediately" after realizing the officer believed he had declined the test, he asked to take it, but the officer refused.[1]
¶ 5. In each case, the district court noted that defendant had been "cooperative and polite throughout the processing." Each court concluded that a defendant's subsequent request to take a breathalyzer test may cure his initial refusal if he changes his mind within a reasonable time and if the State is not unreasonably burdened by the request. Specifically, the Caledonia District Court, Judge Davenport presiding, held that defendant Bonvie had not "refused" because he subsequently requested to take the test within the thirty minutes provided by statute. See 23 V.S.A. § 1202(c) ("The person must decide whether or not to submit to the evidentiary test or tests within a reasonable time and no later than 30 minutes from the time of the initial attempt to contact the attorney."). The Windham District Court, Judge Hayes presiding, did not expressly address whether defendant Gilbeau had "refused" to take the test, but instead adopted the five-part test of the Kansas Supreme Court that later consent to evidentiary testing cures an initial refusal if made:

*1294 (1) within a very short and reasonable time after the prior first refusal;
(2) when a test administered upon the subsequent consent would still be accurate;
(3) when testing equipment is still readily available;
(4) when honoring the request will result in no substantial inconvenience or expense to the police; and
(5) when the individual requesting the test has been in the custody of the arresting officer and under observation for the whole time since arrest.
Standish, 683 P.2d at 1280. The court found that all five factors were met in Gilbeau's case, and there was no allegation that defendant Gilbeau's request to take the test was made more than thirty minutes after he was informed of his right to consult with counsel. Both judges concluded that the State had not met its burden of showing a refusal, and thus entered judgment for defendant at the civil suspension hearing. Judge Hayes held that all evidence of defendant Gilbeau's "refusal" would be suppressed at trial. The State appealed.
¶ 6. Whether, and in what circumstances, a defendant may cure an initial refusal to take a chemical test is a question of law that we review de novo under our implied-consent statute. See Wright v. Bradley, 2006 VT 100, ¶ 6, 180 Vt. ___, 910 A.2d 893 ("Issues of statutory interpretation are subject to de novo review."). We begin with the relevant Vermont authority, but because our prior decisions do not resolve the matter conclusively, we proceed to examine the holdings of courts in other jurisdictions that have addressed the issue.
¶ 7. We look first to the statute. Section 1202 of Title 23 concerns "consent to taking of tests to determine blood alcohol content" generally. Subsection (a)(1), Vermont's "implied consent" law, states that the driver or person "in actual physical control of any vehicle on a highway in this state is deemed to have given consent to an evidentiary test of [their] breath for the purpose of determining the person's alcohol concentration or the presence of other drug in the blood." Refusal to take the test when an officer has "reasonable grounds to believe" the operator is in violation of § 1201 is sanctioned by an automatic six-month suspension of the operator's license, 23 V.S.A. § 1205(a), and by making the refusal admissible as evidence of guilt in a criminal proceeding, § 1202(b). Accordingly, the statute further requires that operators receive a series of warnings upon being asked to take the test, including a warning that refusal will result in a six-month license suspension, id. § 1202(d)(2), that evidence of the refusal is admissible in a criminal proceeding, id. § 1202(d)(6), and that the individual has the right to consult with an attorney before deciding whether to take the test. Id. § 1202(d)(4). The operator must decide whether to take the test "within a reasonable time and no later than 30 minutes from the time of the initial attempt to contact the attorney . . . regardless of whether a consultation took place." Id. § 1202(c).[2]
*1295 ¶ 8. We agree with the State that the plain language of the above provisions does not necessarily afford an individual the right to "change his mind" about taking a breath test within the thirty-minute window. On the other hand, nothing in the statute expressly precludes later consent after an initial refusal. Here, we are mindful of our repeated conclusion that § 1202(c) "evidences the [L]egislature's `concern that any refusal to be tested [shall] not be lightly decided, by providing for counsel and for time for reflection.'" State v. Kozel, 146 Vt. 534, 538, 505 A.2d 1221, 1223 (1986) (quoting State v. Carmody, 140 Vt. 631, 636, 442 A.2d 1292, 1295 (1982)). We have also recognized the Legislature's general encouragement of breath tests through its conditioning of motor-vehicle licenses on an operator's implied consent to take such tests. Veilleux v. Springer, 131 Vt. 33, 39, 300 A.2d 620, 624 (1973) (explaining legislative encouragement of "the availability of scientific evidence" through implied consent law). More broadly, in concluding under a previous version of the implied-consent law that individuals must be informed of their right to consult with an attorney before deciding whether to take the test, we recognized the many criminal and civil ramifications of this decision, and held that such a "complicated decision" should be made with the option of receiving the advice of counsel, or else not be binding. See Duff, 136 Vt. at 539-40, 394 A.2d at 1146. In doing so, we construed the statute liberally "in accordance with the nature of the right it affords." Id. at 540, 394 A.2d at 1146.
¶ 9. We have dealt at least three times before with DUI defendants who responded ambiguously to requests to take a breath test. In State v. Benware, the question was whether the defendant had refused the test when he offered to take it after the officer made "five attempts to administer the test over a period of forty-one minutes." 165 Vt. 631, 632, 686 A.2d 478, 479 (1996) (mem.). During that time, the defendant "forced numerous burps while repeatedly making obnoxious comments and gestures" to the officer. Id. We noted that the defendant had "deliberated beyond the thirty-minute statutory time limit imposed by 23 V.S.A. § 1202(c)," but we declined to resolve the matter on that ground, instead affirming on the basis that his "stated change of mind was not genuine." Id. at 632, 686 A.2d at 480. We stated that 23 V.S.A. § 1202(c) "provides a defendant with a reasonable amount of time to decide whether to submit to the breath test, but no longer than thirty minutes after the first attempt to contact an attorney." Id. at 632, 686 A.2d at 479.
¶ 10. We similarly left open the question of "how processing officers ought to respond to good faith and timely changes of mind" with respect to a request to take a breathalyzer test in State v. Lynaugh, 148 Vt. 124, 127, 530 A.2d 555, 558 (1987). There, the defendant expressly refused to take the test twice, was described as "difficult and arrogant" during his processing, and ultimately asked a second officer to administer the test more than thirty minutes after the first officer had arranged contact with an attorney. See id. at 126, 530 A.2d at 557. In these circumstances, we affirmed the trial court's finding that the defendant had refused to take the test. Id. at 127, 530 A.2d at 558.
¶ 11. Finally, Stockwell v. District Court of Vermont involved an "offensive, insulting, . . . abusive . . . and at times . . . physically combative" DUI arrestee, therein the plaintiff, 143 Vt. 45, 47, 460 A.2d 466, 467 (1983), who "would not give any clear verbal expression of either consent or *1296 refusal" to the breath test. Id. at 48, 460 A.2d at 467. The attorney contacted for the plaintiff by the officer indicated to the police that he did not recommend that plaintiff take the test. Id. The officers concluded nineteen minutes after the lawyer had been contacted that the plaintiff's actions indicated a refusal. Id. In response to his argument that he was wrongly deprived of his thirty minutes to decide, we stated the following:
Plaintiff had a reasonable time to decide whether to submit to testing. It is true that the time does not terminate conclusively against a suspect's interests as a matter of law until the thirty minutes have elapsed following the initial attempt to contact the attorney unless he refuses before the period has run. However, this is a remote cousin indeed from the proposition urged by plaintiff that a reasonable time can never terminate prior to the running of the period. . . . The statutory reasonable time is tolled either by the expiration of the thirty minutes or by a reasonably clear refusal to submit to the test, whichever occurs first in time. Accordingly, we hold that the statutory thirty minutes is the maximum reasonable time, not the minimum.
Id. at 49-50, 460 A.2d at 468.
¶ 12. While informative, the above case law does not dispose of the issue before us. Benware and Lynaugh, cases in which the defendants' changes of mind were not in good faith and were outside of the thirty-minute period, are consistent with a rule that good-faith changes of mind to consent to the test, if made within the thirty minutes afforded by 23 V.S.A. § 1202(c), are permissible. As for Stockwell, although particular language in the decision could suggest otherwise, we do not conclude that the decision as a whole points in the opposite direction.
¶ 13. Stockwell was an interpretation of what is "reasonable" as that term is used in the timing provision of the implied-consent statute, 23 V.S.A. § 1202(c). 143 Vt. at 49, 460 A.2d at 468. It was not a case involving a good-faith change of heart; indeed, Mr. Stockwell "showed not the slightest indication that he was giving any serious consideration to the request made of him several times." Id. at 51, 460 A.2d at 469. He was abusive to the point of being "physically combative" and was "uncooperative from the outset and never changed." Id. at 47, 51, 460 A.2d at 467, 469. Moreover, he argued that he was entitled to at least thirty minutes to make a decision on whether to take the test; defendants make a very different argument here. We need not disturb our conclusion in Stockwell that it was reasonable in those circumstances for the officers to conclude that Mr. Stockwell had impliedly but unequivocally refused the test before the statutory period had run. Id. at 51, 460 A.2d at 469. In contrast, defendants in the cases at bar exhibited precisely the sort of cooperation and good faith consideration of the breath test we seek to encourage. See Kozel, 146 Vt. at 538, 505 A.2d at 1223 (describing "time for reflection" in implied-consent law as indicative of legislative concern that refusal not be decided "lightly"). Cf. Schroeder v. Dep't of Motor Vehicles & Pub. Safety, 105 Nev. 179, 772 P.2d 1278, 1280 (1989) (per curiam) ("One who is lawfully under arrest for drunk driving should not be able to defeat the purpose of the implied consent statutes by being uncooperative with the arresting officers.").
¶ 14. We conclude that the issue before us is determined neither by the specific wording of the refusal statute nor by our precedents. Therefore, we are again in the situation we found ourselves in Duff and must construe the statute in light of *1297 the right it affords, as we did in Duff. See Duff, 136 Vt. at 540, 394 A.2d at 1146. In doing so, we turn to the approaches taken in other jurisdictions for guidance.
¶ 15. A cross-country review reveals a surprising volume of litigation on the topic, with two primary lines of cases. One provides that an operator may effectively agree to take the test after an initial refusalthe so-called "flexible" approach. See Lund v. Hjelle, 224 N.W.2d 552, 557 (N.D.1974) (subsequent consent valid if made within reasonable time, test would still be accurate, equipment still readily available, no substantial inconvenience or expense to police, and individual in police custody continuously since arrest); Pruitt v. Dep't of Pub. Safety, 825 P.2d 887, 894 (Alaska 1992) (adopts Lund factors); Gaunt v. Motor Vehicle Div., 136 Ariz. 424, 666 P.2d 524, 528 (Ct.App.1983) (subsequent consent honored if defendant still in custody, no substantial inconvenience for police, testing equipment still available, and test results still accurate); Zahtila v. Motor Vehicle Div., 39 Colo.App. 8, 560 P.2d 847, 849 (1977) (subsequent consent valid if officer still available and delay does not materially affect test results); Larmer v. Dep't of Highway Safety & Motor Vehicles, 522 So.2d 941, 944 (Fla.Dist.Ct.App. 1988) (retraction of initial refusal valid if given moments later, while still in continuous presence of officer, and if no inconvenience would result); Dep't of Pub. Safety v. Seay, 206 Ga.App. 71, 424 S.E.2d 301, 302 (1992) (adopts Standish factors, supra); State v. Moore, 62 Haw. 301, 614 P.2d 931, 935 (1980) (adopts Lund factors); Pangburn v. State, 124 Idaho 139, 857 P.2d 618, 620 (1993) (subsequent consent valid if individual still in police custody, testing equipment and personnel "reasonably" available, and delay will not materially affect test result); Standish, 683 P.2d at 1280 (factors supra); Pickard v. Dep't of Pub. Safety, 572 So.2d 1098, 1101 (La.Ct. App.1990) (adopts Moore, supra); In re Suazo, 117 N.M. 785, 877 P.2d 1088, 1096 (1994) (adopts Lund factors, supra, with stricter temporal standard); Baldwin v. State ex rel. Dep't of Pub. Safety, 849 P.2d 400, 406 (Okla.1993) (adopts Standish factors).
¶ 16. The other concludes that an operator may not subsequently consent after a previous refusalthe so-called "absolute" approach. See, e.g., Zidell v. Bright, 264 Cal.App.2d 867, 71 Cal.Rptr. 111, 113 (1968) (police need not arrange for belated test once defendant had "refused to submit after fair warning of the consequences"); People v. Shorkey, 23 Ill.App.3d 662, 321 N.E.2d 46, 48 (1974) (adopts bright-line rule that, where all statutory requirements met, refusal to take breath test is binding and cannot be nullified by subsequent consent); Hoffman v. Iowa Dep't of Transp., 257 N.W.2d 22, 26 (Iowa 1977) ("One refusal is determinative."); Humphries v. Commonwealth, 807 S.W.2d 669, 670 (Ky.Ct. App.1991) (subsequent testing cannot cure initial refusal, which is a violation of statute); State v. Landry, 428 A.2d 1204, 1206 (Me.1981) ("Once an arrestee voluntarily refuses a reasonable opportunity to elect a chemical test, the police need not go out of their way to coddle a later change of mind."); Blanchard v. Director of Revenue, 844 S.W.2d 589, 590-91 (Mo.Ct.App. 1993) ("Subsequent conduct indicating an agreement to submit is irrelevant even in a case such as this, where petitioner asserts he had an `immediate change of heart. . . .'"); Hunter v. State, 264 Mont. 84, 869 P.2d 787, 790 (1994) ("We restate the rule that, in Montana, subsequent consent does not cure a prior refusal to submit to a blood alcohol test."); Wisch v. Jensen, 221 Neb. 609, 379 N.W.2d 755, 758 (1986) (summarizing previous holding that subsequent offer to take test does not cure initial refusal and noting that in instant *1298 case technician was already leaving when defendant changed his mind); Schroeder, 772 P.2d at 1280 ("[W]e reject [defendant's] contention that his eventual request to take a chemical sobriety test vitiated his prior refusals."); Harlan v. State, 113 N.H. 194, 308 A.2d 856, 859 (1973) (rejecting subsequent consent one hour after initial refusal, but leaving open question when defendant "almost immediately" retracts refusal); State v. Bernhardt, 245 N.J.Super. 210, 584 A.2d 854, 858 (App. Div.) (adopting "bright line rule . . . which precludes a defendant from curing a refusal"); Leviner v. Dep't of Hwys. & Pub. Transp., 313 S.C. 409, 438 S.E.2d 246, 248 (1993) (adopts bright-line rule); Baker v. Schwendiman, 714 P.2d 675, 677 (Utah 1986) (per curiam) (where officer "spent approximately thirty minutes attempting to persuade plaintiff to submit to a test," and where consent came fifteen to twenty minutes later "after the intoxilyzer machine had been shut down," consent did not cure refusals); Dep't of Licensing v. Lax, 125 Wash.2d 818, 888 P.2d 1190, 1193 (1995) (adopts bright-line rule).
¶ 17. As the above summary demonstrates, the two lines of cases are not nearly straight; some in the "absolute" jurisdictions are consistent with those in the "flexible" camp, and vice versa. Compare, e.g., Standish, 683 P.2d at 1280 ("flexible" case requiring continuous custody by "arresting officer" and ready availability of testing equipment for later consent to be valid), with Schroeder, 772 P.2d at 1280 ("absolute" case prohibiting later consent after arresting officer had left), and Baker, 714 P.2d at 677 ("absolute" case prohibiting later consent after testing equipment was shut down); see also Baldwin, 849 P.2d at 405 (recognizing difficulty in "artificially categorizing jurisdictions as two separate camps"). The statute in place in North Carolina most resembles our own in that it provides operators a thirty-minute period to contact an attorney to decide whether to take the test. North Carolina is commonly called an "absolute" jurisdiction, but its holdings that refusal cannot be reconsidered involve consent given outside the thirty-minute period. See Etheridge v. Peters, 301 N.C. 76, 269 S.E.2d 133, 136 (1980) (finding willful refusal to submit to test after statutory thirty-minute period had expired); Seders v. Powell, 298 N.C. 453, 259 S.E.2d 544, 548-50 (N.C.1979) (same). These cases do not make clear whether an operator may reconsider a refusal within the thirty-minute period.
¶ 18. The many courts that allow operators to reconsider a refusal coalesce around two rationales: (1) fairness to the operator, and (2) furthering the purpose of implied-consent statutes by encouraging the administration of chemical tests in as many cases as possible. See, e.g., Gaunt, 666 P.2d at 527 (recognizing clarity afforded by absolute rule, but concluding that "it could lead to unnecessarily harsh and self-defeating results"); Moore, 614 P.2d at 935 ("We . . . decline to hold with a rule of law which would rigidly and unreasonably bind an arrested person to his first words spoken, no matter how quickly and under what circumstances those words are withdrawn."); In re Smith, 115 Idaho 808, 770 P.2d 817, 821 (Ct.App.1989) (concluding that flexible rule "better serves the public interest in obtaining scientific information about the blood-alcohol levels of motorists accused of driving under the influence"); Standish, 683 P.2d at 1280 ("We believe that the administration of the test should be encouraged and the person arrested should be given every reasonable opportunity to submit to it."); Lund, 224 N.W.2d at 557 (recognizing that because "accuracy of a chemical test under [the implied consent law] does not depend upon its being administered immediately after an arrest *1299 . . . a delay for a reasonable period of time while an arrested person considers or reconsiders a decision" to take a test "will not frustrate" objective of law) (emphasis added); Baldwin, 849 P.2d at 405-06 ("Arresting officers apparently recognize that the circumstances of the arrest along with the altered mental state of a drunk driver could result in an initially rash decision, which a few minutes of reflection by a ride to a jail in a patrol car could correct."). As the U.S. Supreme Court has acknowledged, evidence from a chemical test is preferable because "the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test." South Dakota v. Neville, 459 U.S. 553, 564, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983).
¶ 19. Two different rationales also emerge from the "absolute" jurisdictions: a desire to obtain the best possible evidence, and a concern that allowing conditional refusals would require officers to remain available for unreasonable periods to accommodate a change of heart. See, e.g., Zidell, 71 Cal.Rptr. at 113 ("It would be inconsistent with the purpose of the statute to hold that [the officers] were required to turn aside from their other responsibilities and arrange for administration of a belated test . . . once appellant had refused to submit after fair warning of the consequences."); Humphries, 807 S.W.2d at 670 ("Subsequent testing [cannot] cure a violation of the statute, if it could, then delays in testing would increase so bloodstream alcohol levels could deteriorate, and accurate evidence samples could no longer be obtained."); Bernhardt, 584 A.2d at 858 (adopting bright-line rule, stating that otherwise police would have to "wait for an indefinite period in an attempt to be able to refute a defendant's assertion that although he or she changed his or her mind and consented within a reasonable time, the police improperly disallowed a cure"); Lax, 888 P.2d at 1193 ("If a refusal can be withdrawn or negated, the drunk driver has a tool which could be used to manipulate the officer and gain extra time. . . . This individualized consideration may take time more profitably spent dealing with other, perhaps more urgent tasks.").
¶ 20. We generally find the rationale for the flexible rule more compelling, in part because we can apply standards that respond to the objections stated in the "absolute" cases. Thus, we adopt the flexible rule subject to the Standish standards as discussed and modified below.
¶ 21. We are particularly persuaded by the desire to obtain the best evidence, which all would agree is the test result. The Vermont implied consent-law "encourages the availability of scientific evidence to make . . . a determination [of impairment]." Veilleux, 131 Vt. at 39, 300 A.2d at 624. As already noted, a test result over the statutory limit is much stronger evidence of impaired operation than is the refusal to take the test. Neville, 459 U.S. at 564, 103 S.Ct. 916. In general, it is also more definitive evidence than the signs of intoxication and impaired operation that an officer might observe. For this reason, the Legislature has adopted alternative definitions of the crime, one with the main element of the crime measured solely by the test result. 23 V.S.A. § 1201(a)(1).
¶ 22. We recognize that obtaining the best evidence is also a goal of the "absolute" rule because the accuracy of the test in measuring alcohol concentration at the time of operation declines over time, such that administration of a test as soon as possible after operation is desirable. By definition, a test administered after an initial refusal will occur later than if the operator had consented in the first instance. But the issue should not turn *1300 solely on the timing of consent. Instead the choice we face is between imposing an arbitrary sanction for refusal and obtaining a test result that shows the extent of the operator's impairment at the time the test is administered. Faced with this choice, we favor obtaining the test result if it remains sufficiently accurate to show impairment at the time of operation.
¶ 23. Consistent with this choice, we have held that breathalyzer evidence taken "nearly two hours after the operation of the vehicle" may be admissible when the results are appropriately related back by an expert witness. State v. Gray, 150 Vt. 184, 187, 552 A.2d 1190, 1192 (1988). In most instances, testing is proper only if completed within the period clearly defined by 23 V.S.A. § 1202(c). Our decision in this case in no way erodes the clear standard set forth by § 1202(c). Instead, in adopting a flexible rule, we are guided by flexible language that is present both in Gray and 23 V.S.A. § 1204(a)(3), which allows a permissive inference that a test result of .10 or greater within two hours of operation shows operation under the influence of alcohol.
¶ 24. We are aided in ensuring the accuracy of the test result by the thirty-minute statutory time limit from the time the first attempt to contact a lawyer is made. The Legislature has decided that a test within the statutory time limit provides a sufficiently accurate indication of impairment at the time of operation. This judgment is consistent with experience from around the country. See Pickard, 572 So.2d at 1100 (flexible rule recognizes "although blood-alcohol levels vary over time, they do not change so rapidly that a short delay necessarily would invalidate a test result").
¶ 25. Further, a flexible rule is consistent with the protections we have previously afforded defendants in this context. In Welch, we imposed a limited right to counsel to aid the operator in making the decision whether to take the test because of the serious consequences of the decision. 135 Vt. at 321-22, 376 A.2d at 355. We were aware that consultation with counsel would delay the decision whether to take the test and required access to counsel only when "such access is requested and is readily available and will not interfere with investigation of the matter at hand." Id. at 322, 376 A.2d at 355. As discussed above, we amplified the right created in Welch in Duff, 136 Vt. at 540, 394 A.2d at 1147, calling the evidentiary-test decision faced by the operator "complicated."
¶ 26. Additionally, we are not persuaded by the second rationale of the "absolute" jurisdictionsthat allowing a defendant's subsequent consent to cure his initial refusal will require officers to "turn aside from their other responsibilities and arrange for the administration of a belated test." Zidell, 71 Cal.Rptr. at 113. Again, the statutory time limit answers much of the concern. The statute expressly affords defendants "a reasonable amount of time to decide whether to submit to the breath test, but no longer than thirty minutes after the first attempt to contact an attorney," Benware, 165 Vt. at 632, 686 A.2d at 479 (citing 23 V.S.A. § 1202(c)), so officers are already required to wait up to thirty minutes. We can require that any reconsideration occur within a reasonable time and within the statutory time limit of thirty minutes. As the cases before us show, it is unlikely that allowing reconsideration of a refusal will divert officers from other activities for any significant amount of time.
¶ 27. The cases before us demonstrate another reason to adopt the flexible rule. Not surprisingly, the quality of the communication between the officer and the *1301 probably-intoxicated operator was not optimum in either case, and in both cases the operator claimed that he did not refuse to take the test. Thus, were we to adopt the absolute rule, trial courts like the one in Bonvie would be left with the mind-reading exercise of determining if a defendant refused based on communications like the following:
Officer: "Will you give me a sample of your breath as evidence?"
Defendant Bonvie: "My lawyer told me not to answer any questions."
Officer: "Well, are you going to provide a sample of your breath?"
Defendant Bonvie: "I guess no."
The officer: "Is that a no?"
Defendant: "No."
In some cases, that exercise is unavoidable. But in many, including those before us, the opportunity for the operator to reconsider his answer when the officer's interpretation of his words becomes apparent to him obviates the need for difficult, case-by-case interpretations of vague, inconclusive verbal exchanges.
¶ 28. We emphasize that we are not holding that the police must wait thirty minutes after counsel is contacted in the event that the operator decides to reconsider his refusal. See Standish, 683 P.2d at 1280 ("The arresting officer need not sit and wait for the person to change his or her mind, and thus neglect other duties."). That position was necessarily rejected in Stockwell, and, again, we see no reason to reconsider that decision here. We also reaffirm our conclusion in Stockwell that officers may find refusal to the test based on an abusive and assaultive response to a request to take it, and they need not indulge the operator for thirty minutes in the absence of any indication he intends to be cooperative. Stockwell, 143 Vt. at 51, 460 A.2d at 469.
¶ 29. The Windham District Court in Gilbeau adopted the standards for determining the effectiveness of a reconsidered decision to take the test as set out in Standish, 683 P.2d at 1280. On review, we agree with that adoption subject to two modifications. The first is that the initial factorthe timeliness of the defendant's subsequent consentis controlled by the reasonableness standard and thirty-minute window of 23 V.S.A. § 1202(c). We confirm what the language of § 1202(c) clearly states: a test is timely if made "within a reasonable time" and no later than thirty minutes. Id. We also modify the fifth factor regarding the continuous custody and observation of the defendant by the officer as discussed below. These standards reflect a fair balance of the considerations applicable on the issue before us.
¶ 30. In general, we are dealing with cases in which the allowance of reconsidered consent is reasonable because the reconsideration occurred during the initial processing when the operator learned that his words were interpreted as a refusal and understood the consequences of that refusal. Thus, the Windham District Court found that defendant Gilbeau's post-refusal consent was effective under the Standish factors, and the State has not contested that analysis. We affirm in Gilbeau on that basis.
¶ 31. The Caledonia District Court did not apply the Standish factors to defendant Bonvie, and ordinarily we would remand for that analysis. The court did, however, make findings of fact outlined below, and we conclude under those findings that the Standish standards were met as a matter of law. Thus, we also affirm in Bonvie.
¶ 32. The findings in Bonvie were as follows:

*1302 The court finds based on the evidence that defendant changed his mind in good faith and was not attempting to procrastinate in the hopes of improving the test result. Defendant's response to the officer's initial question about taking the test indicates that he was confused by the advice he received from his attorney. He appears to have equated his attorney's advice not to answer questions with a decision to say "no" when the officer asked him if he would provide a sample of his breath. Although the officer had informed him that the suspension would be six months if he refused the test, he appears not to have really absorbed this information until the officer handed him paperwork that said his license would be suspended for six months.
23 V.S.A. § 1202(c) provides that a person must decide whether or not to submit to the evidentiary test "within a reasonable time and no later than 30 minutes from the time of the initial attempt to contact the attorney." 23 V.S.A. § 1202(c). The initial attempt in this case to contact an attorney was made at 1:14 a.m. by the officer's watch. The officer testified that he concluded the processing at 1:53 a.m. He further testified that the defendant changed his mind and asked to take the test about 10 minutes before that or at 1:43 a.m. Defendant's change of mind was thus timely, made just barely within the 30 minute period following the initial attempt to contact an attorney.
In its analysis, the court added that "defendant and the officer were both still in the processing room" and that "[t]he Data-master machine was in the room ready to be used and it would have taken very little additional time to allow defendant to take the test."
¶ 33. As we stated above, compliance with the first Standish factor is measured by compliance with 23 V.S.A. § 1202(c). The court found such compliance, and its conclusion is supported by the evidence.
¶ 34. As to the second factor, the court found that defendant consented to take the test one hour and twenty minutes after he was stopped by the police, and so "the test would have been within the two hour presumptive framework." Although the court did not identify when the initial refusal was made, the evidence indicates that it occurred around 1:30 a.m., so that approximately thirteen minutes elapsed between the refusal and the consent at 1:43 a.m. The State has not contended that the second factorthat a test administered upon the subsequent consent would still be accurateis not met. In the absence of any evidence to the contrary, we assume, consistent with past relation-back cases, that it was. See, e.g., Gray, 150 Vt. at 187, 552 A.2d at 1192 (finding test taken "nearly two hours after the operation of the vehicle" admissible where results appropriately related back by an expert). The additional thirteen minutes would not turn a valid test result into an invalid one. We note that the decisions in other flexible-rule jurisdictions overwhelmingly allow reconsidered consent where the refusal was less than twenty minutes before the consent. See J. Purver, Annot., Driving While Intoxicated: Subsequent Consent to Sobriety Test as Affecting Initial Refusal, 28 A.L.R.5th 459, § 8 (1995).
¶ 35. On the third factor, the court found that the testing equipment was still readily available, and this finding is uncontested. Similarly, the fourth factor is clearly met because the officer had not completed the processing when defendant consented, and there is no evidence of substantial inconvenience or added expense.
*1303 ¶ 36. Finally, we believe the fifth factorthat the individual requesting the test has been in the custody of the arresting officer and under observation for the whole time since arrestis met sufficiently in this case. We note that in Standish the Kansas Supreme Court required a defendant to have been under the arresting officer's "observation for the whole time since arrest." 683 P.2d at 1280. In defendant Bonvie's case, the trial judge noted that defendant spoke to his attorney outside of the presence of the arresting officer, and defendant was apparently left alone in a police room to make this call. There is no allegation that he was ever out of police custody or that he left the station prior to his request to take the test. We find these facts sufficient to meet the fifth Standish factor. We have held that a defendant's conversation with a lawyer must be "reasonably private." State v. Sherwood, 174 Vt. 27, 30, 800 A.2d 463, 466 (2002). Our concern that defendant be continuously observed relates particularly to the period between the refusal and the consent. Such observation is sufficient to ensure that nothing occurs in that period that would make the test result less accurate than it would have been had defendant consented initially. Thus, we do not require that the officer continuously observe the operator during the consultation with the lawyer. Nor are we concerned about continuous observation before the lawyer consultation unless there is some reason to believe that events during that period made the delay in giving consent more significant. To that extent, we modify the fifth Standish factor.
¶ 37. Ultimately, the defendant in each case exhibited a good-faith change of mind to take the test before the thirty-minute period provided in 23 V.S.A. § 1202(c) had expired, and each of the factors outlined in Standish, 683 P.2d at 1280, were met as discussed above. Defendants' subsequent consent to take the test in each case was, therefore, valid under our implied-consent statute.
The judgment in each case is affirmed.
NOTES
[1] Although it is disputed whether defendant Gilbeau was merely confused and did not in fact refuse in the first place, or whether he changed his mind in later agreeing to take the test, this is a distinction without a difference in light of our holding. Consent, if made within the thirty-minute window, is effective consent whether it occurs after a change of heart or not. We assume, arguendo, that both defendants "refused" to take the test at first.
[2] Section 1202(d)(4) requires that the operator be informed of the provisions of § 1202(c). It codifies our holding in State v. Duff that a previous version of Vermont's implied-consent law implicitly required individuals stopped for DUI to be informed of their statutory right to consult with an attorney before deciding whether to take the breath test. 136 Vt. 537, 539, 394 A.2d 1145, 1146 (1978). Similarly, the right to consult with an attorney in this context was first provided by this Court in State v. Welch, 135 Vt. 316, 318, 322, 376 A.2d 351, 352, 355 (1977), before it was codified in what is now § 1202(c).