796 A.2d 476 (2001)
AGENCY OF NATURAL RESOURCES, Harbor Management Corporation and the Summit Management Corporation
v.
UNITED STATES FIRE INSURANCE CO. and North River Insurance Company.
No. 00-287.
Supreme Court of Vermont.
November 21, 2001.
Motion for Reargument Withdrawn February 8, 2002.
*477 William H. Sorrell, Attorney General, William E. Griffin, Chief Assistant Attorney General, and Bridget C. Asay, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.
John L. Putnam and David R. Putnam of Stebbins, Bradley, Wood & Harvey, P.A., Hanover, New Hampshire, for Defendants-Appellants.
Present: AMESTOY, C.J., DOOLEY, MORSE and SKOGLUND, JJ., and COOK, District Judge, Specially Assigned.
AMESTOY, C.J.
Defendant North River Insurance Company appeals a Washington Superior Court order granting plaintiff's, Agency of Natural Resources', motion for summary judgment.[1] Defendant contends that the court erred in ordering North River to pay restitution to the State for costs incurred in the investigation and clean-up of an underground petroleum leak. Defendant raises four arguments on appeal: (1) the State does not have a legal cause of action under 10 V.S.A. § 1941(f) and therefore does not have standing; (2) the relevant provision of the North River insurance policy specifically excludes insurance coverage of costs arising out of a State-directed clean-up of pollutants; (3) the trial court erred in finding liability without sufficient facts to determine first, if the leak was an occurrence that triggered the policy and second, the amount of the damages that should be allocated to North River; and (4) the trial court erred by not enforcing discovery orders. We affirm but remand in part for further findings on the allocation of damages.
*478 In December 1993, the Department of Environmental Conservation (DEC) began investigating reports of contaminated drinking water in Sherburne,[2] Vermont. After testing several wells, DEC identified the potential source of the contamination to be an underground fuel tank on property owned by Harbor Management Corporation, hereinafter Summit Lodge. DEC contacted Summit Lodge in January of 1994 and directed that it clean the contamination.
Summit Lodge hired Marin Environmental, an environmental consulting firm, to handle the contamination. Marin Environmental removed the underground fuel tank and confirmed, after testing the soil, that the tank was the source of a release of gasoline into the subsurface contaminating the local bedrock aquifer and a total of thirty-two private wells. With DEC's approval, Marin Environmental installed a groundwater extraction and treatment system and a soil vapor extraction system. The extraction system was somewhat effective, reducing contamination, but certain wells still test positive for pollutants above the level of drinking water standards. In contrast, the soil vapor extraction system put into place by Summit Lodge removed nearly all recoverable contamination from the soils overlying the bedrock aquifer.
In 1994, Summit Lodge filed a claim with their insurance companies, United States Fire Insurance (USFI) and North River. USFI denied coverage based on an exclusion within the pollution endorsement to the policy. North River did not respond. In the same year Summit Lodge applied to the Petroleum Cleanup Fund for reimbursement. The State reimbursed nearly all costs, limiting Summit Lodge's liability to $10,000. The State spent approximately $715,000 in the investigation and clean-up of the site, including the costs of providing bottled drinking water to the affected neighbors, and expects to spent an additional $100,000 to $200,000 before the clean-up is complete.
The State filed suit against USFI and North River in federal district court in 1997. In 1998, the parties agreed to dismiss the original action for lack of jurisdiction, and the State refiled in Washington Superior Court. The parties engaged in discovery and filed cross-motions for summary judgment in April of 1999. In an order dated December 30, 1999, Judge Teachout granted the State's motion finding that the leak at Summit Lodge was an occurrence covered under the North River policy and that defendants were liable for the costs that the State incurred.
Defendant filed a motion for reconsideration and on May 16, 2000, Judge Bryan denied the motion concluding (1) the State has standing pursuant to 10 V.S.A. § 1941(f); and (2) that the exclusion contained in the pollution endorsement of the North River policy does not exclude the costs associated with clean-up of contamination on a third-party property. On May 26, 2000, judgment was filed against defendant for $714,791.94 in costs, 12% pre-judgment interest, and "all future reasonable and necessary expenses for the remediation of the Summit lodge site." This appeal followed.

I.
We review a trial court's decision to grant summary judgment de novo. Hence, we will apply the same standard as the trial court, and its decision to grant a *479 motion for summary judgment will be affirmed if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Chapman v. Sparta, 167 Vt. 157, 159, 702 A.2d 132, 134 (1997); see V.R.C.P. 56.
We first address defendant's argument that the State has no standing to bring a claim for restitution against North River pursuant to a policy under which they are not the insured. Because we hold that the State is granted a cause of action by 10 V.S.A. § 1941(f), we disagree.
Article III of the United States Constitution limits federal courts' jurisdiction to actual cases or controversies. U.S. Const. art. III. Vermont has adopted this requirement and with it the requirement that for plaintiffs to have standing to bring a case, they must have suffered a particular injury that is attributable to the defendant and that can be redressed by a court of law. Parker v. Town of Milton, 169 Vt. 74, 77-78, 726 A.2d 477, 480 (1998) (holding this Court has adopted the test articulated by the United States Supreme Court in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).
"The question of standing `involves both constitutional limitations on ... jurisdiction and prudential limitations on its exercise.'" Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). These prudential limitations on standing include "the general prohibition on a litigant's raising another person's legal rights, the rule against adjudication of generalized grievances, and `the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" Hinesburg Sand & Gravel Co. v. State, 166 Vt. 337, 341, 693 A.2d 1045, 1048 (1997) (quoting Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).
Defendant concedes that the State can show injury in fact, traceable to the defendant, that could be redressed by a decision favorable to the State. Defendant asserts, however, that the State has no legal right upon which to base a cause of action because neither the explicit language of 10 V.S.A. § 1941(f) nor the State's theory of equitable subrogation is sufficient to allow the State to bring suit in the first instance. It is unnecessary to address the State's contention that its cause of action for restitution is based on the law of equitable subrogation independent of any statute, because  contrary to the argument of defendant  statutory authorization of a right of action does not require express statutory language. Where a statute "expressly or by clear implication grants a right of action," plaintiffs will have standing even where they raise general grievances or seek to enforce the rights of another party. Warth, 422 U.S. at 510, 95 S.Ct. 2197 (emphasis added); see Brown v. Stone, 66 F.Supp.2d 412, 423-24 (E.D.N.Y.1999); United States v. Tribal Dev. Corp., 49 F.3d 1208, 1214 (7th Cir.1995). We have no difficulty in concluding, as did the trial court below, that the language of the Petroleum Cleanup Fund not only authorizes state expenditure for cleanup of contamination caused by petroleum leakage, but also authorizes the State to seek restitution to the Fund for clean-up expenditures where there is insurance coverage for pollution damages.
In construing 10 V.S.A. § 1941, "`our principal goal is to effectuate the intent of the Legislature.'" State v. Brennan, 172 Vt. 277, 280, 775 A.2d 919, 921 (2001) (quoting Tarrant v. Dep't of Taxes, 169 Vt. 189, 197, 733 A.2d 733, 739 (1999)). Section 1941 provides for the Petroleum *480 Cleanup Fund, which reimburses parties that have incurred costs from "the cleanup and restoration of contaminated soil and groundwater caused by releases of petroleum from underground storage tanks, including air emissions for remedial actions, and for compensation of third parties for injury and damage caused by a release." 10 V.S.A. § 1941(b). Under the act, the owner of the contaminating property is responsible for the first $10,000 of costs incurred and can apply for reimbursement for any excess amounts up to $990,000. Id. § 1941(b)(1). Moreover, the act provides that the Secretary of the Agency of Natural Resources (ANR) "may seek reimbursement to the fund of cleanup expenditures... to the extent covered, when there is insurance coverage." Id. § 1941(f).
"The statute authorizing state expenditures for petroleum cleanup is clear and unambiguous." ANR v. Glens Falls Ins. Co., 169 Vt. 426, 431, 736 A.2d 768, 771 (1999). Consistent with that, the statute in subsection (f) clearly establishes that the State may itself seek reimbursement in instances where the land is covered by insurance, to the extent of the coverage. 10 V.S.A. § 1941(f). In interpreting § 1941(f), we are mindful not to render a significant provision of a statute irrelevant. Brennan, 172 Vt. at 280, 775 A.2d at 922. To find that the State has no cause of action against an insurance company to reimburse the Petroleum Cleanup Fund where state expenditures funded the cleanup of an insured site would give no effect to § 1941(f). Although defendant can plausibly assert that § 1941(f) does not contain a sentence expressly granting the State a right of action, it cannot be credibly asserted that the right does not arise by clear implication. The trial court correctly concluded that § 1941(f) grants the State a legal basis upon which to rest its standing in this proceeding.

II.
Defendant contends that exclusion 2(j) of the "Vermont Changes  Pollution" Endorsement, included in the North River policy, bars coverage for any costs associated with the clean-up of pollutants where such clean-up is directed by the State.
In construing insurance policy provisions, this Court follows well established law. "`An insurance policy must be construed according to its terms and the evident intent of the parties as expressed in the policy language.... Disputed terms should be read according to their plain, ordinary and popular meaning.'" Northern Sec. Ins. Co. v. Perron, 172 Vt. 204, 209, 777 A.2d 151, 154 (2001) (quoting City of Burlington v. Nat'l Union Fire Ins. Co., 163 Vt. 124, 127-28, 655 A.2d 719, 721 (1994)). If, however, there is more than one reasonable interpretation of the policy provision, the Court will look to the interpretation most favorable to the insured, placing the burden of showing a claim is excluded on the insurers. Id.
In 1986, in response to an earlier mandate by the Department of Banking and Insurance that insurers provide commercial coverage for pollution in the State of Vermont, the Insurance Services Offices (ISO)[3] filed changes to the Commercial General Liability policy, entitled "Vermont Changes-Pollution." This endorsement to the commercial general liability policy provided in part:
[w]e will pay those sums that the insured becomes legally obligated to pay *481 as damages because of "bodily injury" or "property damage" included within the "pollution liability hazard" to which this insurance applies .... The "bodily injury" or "property damage" must occur during the policy period. The "bodily injury" or "property damage" must be caused by an "occurrence." The "occurrence" must take place in the "coverage territory."
These changes were approved by the Department of Banking and Insurance along with several exclusions to the endorsement.
Defendant notes in particular exclusion 2(j) to the pollution endorsement, which reads in pertinent part, "[t]his insurance does not apply to .... [a]ny loss, cost or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants." Defendant vigorously asserts that the trial court's failure to ascribe to the terms of exclusion 2(j) "their plain, ordinary and popular meaning" deprived the defendant of an "unambiguous provision put into a policy for its benefit."
Defendant's characterization of exclusion 2(j) first requires us to ignore the rationale for a pollution endorsement intended to provide coverage for damage caused by pollution. The purpose of the pollution endorsement contained in this policy stemmed from a Department of Banking and Insurance mandate that insurers in the State of Vermont provide coverage for commercial pollution Defendant's interpretation of exclusion 2(j) would essentially eviscerate that coverage, because under Vermont law ANR routinely investigates pollution contamination and requests or directs clean-up of contaminated properties. In fact, property owners have a legal obligation to report contamination to ANR. 10 V.S.A. § 6617. It is, to say the least, highly unlikely that the Department of Banking and Insurance would, at the time of requiring insurers to expand pollution coverage, interpret exclusion 2(j) to exclude coverage whenever the State, through ANR, becomes involved in pollution clean-up.
We need not speculate, however, as to the Department's interpretation of exclusion 2(j) because there is an extended exchange of correspondence between the Department of Banking and Insurance and the ISO, which can be read only as confirming the State's position that exclusion 2(j) was never intended to be construed to insulate insurers from providing coverage for third-party property damage caused by pollution whenever clean-up was requested or ordered by a government agency.
The record contains detailed correspondence between these parties as to the meaning of exclusion 2(j) starting in 1993. In a letter dated April 16, 1993, a property and casualty analyst for the Department wrote to the regional manager for ISO expressing the State's interpretation that exclusion 2(j) was meant only to exclude costs associated with a state-directed clean-up of an owner's property, that is, the insurance would cover state-directed clean-up costs for an insured if the insured had caused third-party property damage. The ISO regional manager responded in a letter dated May 7, 1993:
[w]e have no disagreement with your contention that the ... policy with [the pollution endorsement], attached provides coverage for third party claims for property damage .... As a matter of fact, due to the nature of pollution claims, usually the only viable, proper way to indemnify a third party for property damage is to clean-up the damaged property in order to restore it to its original value. The intent of Exclusion j.... is to deal with possible clean-up *482 costs incurred under the Federal Superfund law or any similar state law.
Although defendant would have us declare this exchange irrelevant because it occurred after the policy went into effect, the correspondence precisely addresses the issue raised by defendant: that is, whether the pollution endorsement provides coverage for third-party claims for property damage. While this interpretation is not binding on the Court, we have consistently given weight to the interpretations made within the expertise of an administrative agency. See In re Prof'l Nurses Serv., Inc., 164 Vt. 529, 532, 671 A.2d 1289, 1291 (1996).
Finally, defendant argues that this interpretation of exclusion 2(j) is invalid because it is redundant to the "owned property exclusion" in the policy which restricts coverage to third-party damage. In fact, as the ISO's letters confirm, there will be situations where exclusion 2(j) does exclude third-party coverage, for example, in the case of Superfund costs where a potentially responsible party is held strictly liable without in fact being found negligent. These are the situations exclusion 2(j) intended to exclude, where the costs "arise out of" the government request rather than from liability itself. Therefore, we hold that exclusion 2(j) does not exclude coverage of a third-party or offsite damages in this case.

III.
Defendant contends that the trial court made insufficient findings on whether the leak at Summit Lodge was an occurrence that triggered the policy coverage and, if so, what amount of the damages should be allocated to North River.
The policy defines an occurrence as "an accident, including continuous or repeated expose to substantially the same general harmful conditions." As this Court recently reiterated in State v. CNA Insurance Cos., 172 Vt. ___, ___, 779 A.2d 662, 670 (2001), an accident is defined as an "`unexpected happening without intention and design.'" (quoting Nat'l Union Fire Ins. Co., 163 Vt. at 128, 655 A.2d at 721).
Here, defendant suggests that the facts were insufficient to find that the leak was an occurrence under the policy, particularly because the trial court failed to enforce discovery orders against Summit Lodge. This argument is disingenuous in light of the fact that there is no dispute as to the cause of the contamination  the underground fuel tank on Summit Lodge's property slowly leaked gasoline over a period of time, contaminating the soil, bedrock aquifer and neighboring wells. The relevant question is whether the underground fuel tank leak was "without intention and design," and no evidence in the course of the litigation suggests otherwise. See id.
Next, defendant argues that the lack of factual information provided by Summit Lodge prevented it from arguing that the occurrence was "triggered" during the policy period Defendant concedes that the issue of trigger was not briefed at the trial court level, and, in fact, there is no evidence in the record that this issue was raised at all. "We will not reverse a lower court when a party's failure to raise some matter below denied the court an opportunity to consider it." Duke v. Duke, 140 Vt. 543, 545, 442 A.2d 460, 462 (1982).
Finally, defendant asserts that the trial court erred in failing to establish the allocation of damages. Here, we agree. The State contends, and we have held, that exclusion 2(j) of the pollution endorsement limits defendant's liability to third-party, or off-site damages, where the State has directed the clean-up. Accordingly, defendant can be held liable only for those offsite *483 damages. The State argues that because of the nature of the pollution damages in this case the costs cannot be bifurcated between on- and off-site clean-up costs. While this may be the case, it is the province of the trial courts, and not the State, to make the findings of fact, and, therefore, we remand to the trial court with instructions to make findings on the allocation of damages, consistent with this opinion.[4]
Affirmed in part and remanded for the allocation of damages.
NOTES
[1] The parties stipulated to dismiss defendant United States Fire Insurance with prejudice in August of 1999. Furthermore, there is no dispute that Harbor Management Corp.'s policy with North River is the relevant policy for the purposes of this claim. Therefore, we adopt the parties' stipulation to this effect, and hereinafter North River will be referred to as the sole defendant in this appeal.
[2] In 1999, the Town of Sherburne was renamed the Town of Killington, following a petition by the people of Sherburne to the Vermont State Legislature. 1999, Municipal Act No. M-3 § 3 (Bien. Session).
[3] The ISO is a group acting as a policy agent on behalf of many insurance companies, including North River.
[4] Defendant also argues on appeal that the trial court erred in not enforcing discovery orders on Summit Lodge. Defendant never filed a motion for sanctions with the superior court and furthermore, "[e]ven if appellant had established the prerequisites to the availability of sanctions, we stress that the award of sanctions for failure to comply with discovery requests is vested in the sound discretion of the trial judge." In re R.M., 150 Vt. 59, 64, 549 A.2d 1050, 1053 (1988).