2008 VT 113

### R&G Properties, Inc. v. Column Financial, Inc., Wells Fargo Bank Minnesota, N.A. and Capmark Finance Inc. f/k/a GMAC Commercial Mortgage Corp.

[968 A.2d 286]

No. 06-415

Present: **Dooley, Johnson, Skoglund and Burgess, JJ., and Howard, Supr. J., Specially Assigned**

Opinion Filed August 22, 2008

*Lisa Chalidze*, Benson, for Plaintiff-Appellant.

*Heather Z. Cooper* and *Rodney E. McPhee* of *Kenlan, Schwiebert & Facey, P.C.*, Rutland, for Defendant-Appellee Capmark Finance Inc.

¶ 1. **Dooley, J.** Borrower, R&G Properties, Inc. (borrower), appeals an order of the superior court, granting summary judgment to lenders — Column Financial, Inc. (Column), Wells Fargo Bank Minnesota (Wells Fargo), and GMAC Commercial Mortgage Corp. (GMAC) — as to all of borrower's claims. On appeal, borrower argues that the court erred in concluding that the security agreement and mortgage on five of its mobile home parks did not create an unenforceable restraint on alienation. Borrower also argues that: (1) because the prepayment penalties described in the agreement were triggered by lenders' decision to accelerate

payment of the loan, the penalties were unenforceable; (2) because Column lacked a license as required by 8 V.S.A. § 2201, borrower is entitled to withhold payment of interest, principal, and penalties; and (3) the court erred in granting lenders summary judgment as to borrower's contractual bad-faith claim. We affirm in all respects.

¶ 2. Borrower entered into the loan agreement at the heart of this case with Column on November 13, 2000. Pursuant to this agreement, borrower executed a promissory note in the amount of $2,150,000 to evidence the loan given to borrower for the purchase of five mobile home parks (the Loan). Column assigned its interest to Wells Fargo,[1] as trustee for Credit Suisse First Boston Mortgage Securities Corporation. The form of trust managed by Wells Fargo is known as a Real Estate Mortgage Investment Conduit, or REMIC. GMAC services the loans, pursuant to a servicing and pooling agreement with Wells Fargo. REMIC loans involve numerous multifamily and commercial property mortgage loans, pooled by a depositor and transferred to a trust. Purchasers may then acquire undivided interests in the trust, through either public offering or private placement. Certificate holders, the owners of these interests, receive a fixed rate of return on their investment. A REMIC is structured in such a way that the income generated is taxable only to certificate holders. See 26 U.S.C. §§ 860A-860G.

¶ 3. Because the trust requires a stable loan pool, REMIC agreements often prohibit or limit prepayment of individual loans. Section 1.02 of the loan agreement explained that collateral substitution was permitted:

> Prior to the Lockout Expiration Date (defined below), this Note may not be prepaid, either in whole or in part, provided, however, Borrower shall have the right and option to release the Security Property (as hereinafter defined) from the lien of the Security Instrument (as hereinafter defined) in accordance with the terms and conditions of the defeasance provisions set forth in *Section 1.26* of the Security Instrument. This Note may be prepaid in whole but not in part (except as otherwise specifically provided herein) at any time after the date

---

[1] Although Wells Fargo was originally joined in this action, at present, only GMAC remains involved in the case.

six (6) months prior to the Maturity Date (the "Lockout Expiration Date").

Another prepayment provision, § 1.02(c), provided: "[p]artial prepayments of this Note shall not be permitted, except partial prepayments resulting from Lender applying insurance or condemnation proceeds to reduce the outstanding principal balance of this Note as provided in the Security Instrument." The agreement also contained a provision on collateral substitution, which the agreement called defeasance. Section 1.26 stated in pertinent part:

> [T]he irrevocable deposit with Lender of an amount ("*Defeasance Deposit*") of U.S. Government Securities (hereinafter defined) which through the scheduled payment of the principal and interest in respect thereof in accordance with their terms will provide, not later than the due date of any payment, cash in an amount sufficient, without reinvestment, in the opinion of a nationally recognized firm of public accountants expressed in a written certification thereof delivered to independent certified Lender, to pay and discharge Scheduled Defeasance Payments (hereinafter defined).

Section 1.26 stated that collateral substitution was permitted any time two years after the startup date. This provision implements the IRS requirement that "[o]nly Treasury obligations can be substituted for prepaid mortgages, and only two years after the REMIC startup date." G. Lefcoe, *Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment*, 28 Real Estate L.J. 202, 208 (2000). Finally, the security agreement also contains a due-on-sale provision that gives the lender the option to declare the entire indebtedness "immediately due and payable" on sale of "all or any part of the [mortgaged] property."

¶ 4. The loan also included a provision specifying remedies available to lender if borrower violates the agreement. Section 3.1(a) addressed the issue of acceleration and its relationship to prepayment penalties, stating that: "[u]pon any such acceleration, payment of such accelerated amount shall constitute a prepayment of the principal balance of the Note and any applicable prepayment penalty provided for in the Note shall then be immediately due and payable."

¶ 5. In 2003, without the consent of the lenders, borrower entered into a purchase and sale agreement with a third party to sell Eastwood Park (Eastwood), one of the mobile home parks securing the loan, and accordingly sought a partial release from the terms of the mortgage. By letter of February 26, 2003 to GMAC, borrower's president sought "a release/payoff amount with a per diem" for the Eastwood property. GMAC did not reply. In response, borrower commenced an action in Chittenden Superior Court, and sought as emergency injunctive relief the release of the Eastwood property.

¶ 6. The complaint, filed May 5, 2003, recited the above facts and emphasized that borrower could sell Eastwood only if borrower obtained a release from the terms of the mortgage by May 25, 2003. In the complaint, borrower also noted that, while lender had assigned a loan value amount of $157,827 to the Eastwood property, borrower had nonetheless offered to pay $160,000 for its release. To support its claim for release, borrower alleged various theories of liability, including a restraint-on-alienation theory based on lender's refusal to grant borrower a partial release from the terms of the mortgage.

¶ 7. A subsequent motion for emergency relief filed by borrower contained the same allegations as the complaint, but added that borrower was required to comply with the Vermont Mobile Home Park Act by notifying park residents of the intent to sell and by giving them an opportunity to purchase. See 10 V.S.A. § 6242(a)-(b).[2] The motion further stated that borrower had given the required notice on February 22, 2002, that the residents had not indicated an intent to purchase, and thus that borrower had a year to sell according to 10 V.S.A. § 6242(f). According to the motion, borrower had sold on the last day before the expiration of the one year period and would have to start the notification process anew if the sale could not close in May 2003. Accordingly, borrower requested that the court order that "defendant(s) be ordered to discharge their mortgage as it relates to the Eastwood property within forty-eight (48) hours of placement into escrow of the sum of one hundred sixty thousand dollars ($160,000.00)."

¶ 8. The superior court heard the emergency motion on May 23, 2003. Although both Column and GMAC entered appearances,

---

[2] This statute has been recently amended. See 2007, No. 176 (Adj. Sess.), § 64. Because this amendment does not affect the portions of the statute applicable in this case, we do not discuss them further.

Column no longer had an interest in the mortgage, as it had effectively been transferred to GMAC. For its part, GMAC acknowledged that borrower had requested partial prepayment but insisted that the loan and security agreements prohibited it. GMAC also added that the security agreement allowed total, but not partial, collateral substitution, and that, in any event, borrower had not complied with the requirements for collateral substitution.

¶ 9. Borrower responded by changing its theory of relief. Borrower now stated that it did not want to prepay, but instead wanted partial defeasance by substitution of cash collateral in the amount of $175,000. Borrower further argued that the security agreement was silent as to partial collateral substitution, and that in the absence of a prohibition in the contract, borrower had a right to partial collateral substitution. Finally, borrower contended that a prohibition on partial collateral substitution constituted an unenforceable restraint on alienation, because borrower could never sell all five mobile home parks as the Mobile Home Act would effectively require. The court rejected these arguments and denied the motion for injunctive relief, finding that the mortgage agreement did not create a right of partial collateral substitution and that such a right could not be implied without effectively "reform[ing] the deal as a whole."

¶ 10. Even before borrower's action in superior court, borrower began missing loan payments, and on June 23, 2003, GMAC notified borrower that it was in default and that accelerated payment of the note would be required. GMAC thereafter filed a counterclaim demanding full payment of the note, with interest. On January 6, 2004, GMAC began foreclosure proceedings against borrower in Washington Superior Court and moved for the appointment of a receiver. The court denied this motion, because the parties agreed instead to arrange for payment by borrower into an escrow account. A further hearing on the escrow account was held on November 19, 2004.

¶ 11. Meanwhile, both borrower and Column moved for summary judgment in the loan-enforcement action in Chittenden Superior Court. By this time, borrower also contended Column's lack of a license at the time the loan was made rendered it unenforceable. Column argued that it had assigned the loan and mortgage and could not be liable for actions taken by GMAC with respect to borrower's request for prepayment/defeasance. The court granted Column's motion and denied borrower's. First, the

court addressed borrower's claim that the loan was commercially unreasonable. The court disagreed with borrower's argument that the loan agreement was an illegal adhesion contract, concluding instead that it was "an unremarkable, arms['-]length commercial loan agreement."

¶ 12. Next, the court turned to borrower's claims concerning the partial prepayment of the debt. The court noted that "[t]he agreement does not actually bar the conveyance of parks pledged as collateral" as long as all the parks were conveyed. Because borrower had agreed "unambiguously to some restraints on alienation," the court found that borrower could not now avoid the terms of its agreement. For similar reasons, the court rejected borrower's argument that the Vermont Mobile Home Parks Act would make it impossible for borrower to sell all five parks while complying with the notice requirements of the Act.

¶ 13. Finally, the court turned to borrower's argument that the loan agreement was unenforceable because Column lacked a license to lend, as required by 8 V.S.A. § 2201(a). Column relied on an exception for lenders who make "only commercial loans of $1,000,000.00 or more." See 8 V.S.A. § 2201(c)(9). Borrower argued that there was evidence that Column made smaller loans outside Vermont and that those loans prevented application of the exception. The court interpreted borrower's argument "to require all lenders in the world, no matter where or to whom loans are made, to be licensed by Vermont's Commissioner of Banking, Insurance, Securities, and Health Care Administration." The court found this interpretation to be unpersuasive, reasoning that such "super-regulatory powers" would have been "challenged long before now, and on constitutional grounds." Thus, the court granted summary judgment to Column.

¶ 14. In June, concluding that borrower was unlikely to prevail on the merits, the court directed that the funds in the escrow account be disbursed to GMAC. The following December, the foreclosure and lender-liability proceedings were consolidated into the present action, in Washington Superior Court.[3]

¶ 15. Borrower and the remaining lenders each moved for summary judgment. On June 1, 2006, the court granted summary

---

[3] Only the parts of the litigation involving the existence and amount of borrower's liability on the note and security agreement are before us in this appeal.

judgment to GMAC, the remaining lender.[4] The court concluded that the May 2005 ruling "resolve[d] in [lenders'] favor the claims of commercial unreasonableness and restraint on alienation." The court then addressed borrower's remaining claims, which alleged a breach of the duty of good faith and fair dealing. The court rejected these claims because the record revealed that lenders did not act in bad faith but rather "merely attempted to enforce the terms of the note and mortgage agreement." The court also found unconvincing borrower's claims that lenders' initiation of foreclosure proceedings was retaliatory: "[lenders] had no obligation to amend the terms of the note simply because [borrower] considered amendment desirable, and [lenders were] free to seek foreclosure following default. Foreclosure is not retaliatory merely because [borrower] filed its lawsuit first." This appeal followed.

¶ 16. We review an award of summary judgment de novo, construing all doubts and inferences in favor of the nonmoving party. *In re Mayo Health Care, Inc.*, 2003 VT 69, ¶ 3, 175 Vt. 605, 830 A.2d 129 (mem.). "The inquiry is familiar: whether there are any genuine issues of material fact and whether, in their absence, either party deserves judgment as a matter of law." *Collins v. Thomas*, 2007 VT 92, ¶ 6, 182 Vt. 250, 938 A.2d 1208. Borrower's arguments fall generally into several categories: (1) arguments about the applicability and validity of loan provisions on collateral substitution; (2) claims about the reasonableness of prepayment penalties; (3) lender-license claims; and (4) good-faith and fair-dealing arguments. We address these arguments in order.

I.

¶ 17. Borrower argues first that it enjoys a right to partial collateral substitution — that is, substitution of cash for the

---

[4] Following the grant of summary judgment, there was another skirmish over the appointment of a receiver. When the court denied the appointment of a receiver, borrower filed this appeal. We are informed that the foreclosure action is proceeding in Washington Superior Court, primarily with respect to the issues of attorney's fees and the proper amount of prepayment penalties.

The court also dismissed as premature GMAC's counterclaim for the amount due on the loan until the foreclosure action was concluded. The counterclaim underlies some of the issues on appeal — for example, whether GMAC can collect on the note given the unlicensed status of Column. These issues were decided by the trial court and are fully presented on appeal. They are virtually certain to reappear once the foreclosure action is concluded. Therefore, we consider them here.

mortgaged mobile home park that borrower had contracted to sell. In essence, borrower contends that any loan agreement that is silent as to partial collateral substitution should be interpreted to permit it. This is a question of contract construction. "[W]e interpret contracts to give effect to the parties' intent, which we presume is reflected in the contract's language when that language is clear." *In re Adelphia Bus. Solutions of Vt., Inc.*, 2004 VT 82, ¶ 7, 177 Vt. 136, 861 A.2d 1078. We also strive to "give effect to every part . . . and form a harmonious whole from the parts" of a contract. *In re Verderber*, 173 Vt. 612, 615, 795 A.2d 1157, 1161 (2002) (mem.).

¶ 18. While the presumption mentioned by borrower may have some application in appropriate cases, borrower greatly oversimplifies the issue before us. If we construe the contract to give one party — here, the borrower — a right, we necessarily give the other party a responsibility. Thus, borrower asks that we construe the contract to require lenders to accept partial collateral substitution when the parties' agreement does not explicitly require them to. In this case, the parties' intent as reflected in the language of the contract is clearly to the contrary.

¶ 19. As borrower acknowledges, the only authorization for collateral substitution in the security agreement is in § 1.26, and that section contains very specific requirements concerning the type of collateral to be substituted. Furthermore, § 1.26 authorizes only total collateral substitution. The requirements of the agreement are linked to the tax-treatment requirements that often accompany a REMIC loan. See 26 C.F.R. § 1.860G-2(a)(8). For example, the applicable regulations, and the contract terms, require that the substitute collateral must "consist[] solely of government securities (as defined in section 2(a)(16) of the Investment Company Act of 1940 as amended (15 U.S.C. 80a-1))." *Id.* § 1.860G-2(a)(8)(i). As stated above, the prepayment provision of the note — § 1.02 — describes the defeasance procedures set out in § 1.26 as exceptions to the bar on prepayment. Consistent with the collateral substitution policy, § 1.02(a) of the contract provides a limited right of prepayment, but only "in whole . . . not in part."

¶ 20. Under the agreement, the borrower is obligated to give a mortgage in the five mobile home parks that constitute the collateral "TO HAVE AND TO HOLD the Property unto Lender, its successors and assigns forever." Moreover, the due-on-sale

clause provides that a "sale, transfer, [or] conveyance . . . of . . . all or any part of the property . . . without Lender's prior written consent" is an act of default that gives the Lender the right to "declare the secured indebtedness immediately due and payable."

¶ 21. We cannot hold that borrower has a right to collateral substitution if the transfer of the agreed-upon collateral triggers lender's right to declare the whole loan amount due and payable. In looking at the contract as a whole, we hold that the drafters of the agreement clearly intended to allow total collateral substitution under certain circumstances, as specified in § 1.26 of the security agreement, but not to allow partial collateral substitution. See *Metropolitan Life Ins. Co. v. Strnad*, 876 P.2d 1362, 1366 (Kan. 1994) (maxim *"expressio unius est exclusio alterius"* not applicable to construction of payment term of a mortgage note where note and mortgage were not ambiguous).

¶ 22. Borrower next argues that, if partial collateral substitution is not authorized, the security agreement and mortgage constitute an unlawful restraint on alienation. Borrower emphasizes that the restraint in this case is particularly unreasonable because the Vermont Mobile Home Parks Act contains a tenant-notification and first-refusal procedure that would make it impossible for the owner to sell five parks at once.

¶ 23. Restraints on alienation are not favored, and courts determine the reasonableness of a restraint by considering a number of factors. See *Colby v. Colby*, 157 Vt. 233, 236, 596 A.2d 901, 902 (1990). A promissory restraint, the type involved here, is valid if the restraint is qualified to permit alienation to some alienees and if the restraint is reasonable under the circumstances. Restatement (Second) of Property § 404(b), (c). As the Florida Supreme Court has explained:

> The test which should be applied with respect to restraints on alienation is the test of reasonableness. The validity or invalidity of a restraint depends upon its long-term effect on the improvement and marketability of the property. Once that effect is determined, common sense should dictate whether it is reasonable or unreasonable.

*Iglehart v. Phillips*, 383 So. 2d 610, 614 (Fla. 1980).

¶ 24. There are three ways in which the security agreement might be viewed as a restraint on the alienation of the Eastwood Mobile Home Park. The first involves the due-on-sale clause that authorizes the lenders to declare a default if borrower transfers any of the security. However we might otherwise have ruled on the validity of the due-on-sales clause, the issue is now resolved by the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. § 1701j-3(b)(2), which validates such clauses. The Act preempts state laws in the area. *Id.*

¶ 25. A second restraint-on-alienation argument involves the presence of the prepayment premium, a penalty due on default. Although some courts have acknowledged that a prepayment penalty might, under certain circumstances, be an unreasonable restraint on alienation, see, e.g., *Gutzi Assocs. v. Switzer*, 264 Cal. Rptr. 538, 543 (Ct. App. 1989) (collecting cases), most courts confronted with similar facts have rejected borrower's argument. *Strnad*, 876 P.2d at 1369-71 (collecting cases); accord F. Alexander, *Mortgage Prepayment: The Trial of Common Sense*, 72 Cornell L. Rev. 288, 309 (1987) (majority of courts reject argument that prepayment provisions amount to a restraint on alienation). Borrower's argument is that the imposition of the prepayment premium upon acceleration of the entire note amount makes it impossible to transfer one of the mobile home parks.

¶ 26. The recent Restatement (Third) of Property: Mortgages § 6.2, at 403 (1997) provides that an agreement that prohibits prepayment or imposes a charge is enforceable, at least as long as the amount is not unconscionable or otherwise unlawful. These rules are consistent and are "widely sustained by the courts." *Id.* cmt. c ("[I]f the borrower fully understood and had the opportunity to bargain over the clause, either with the assistance of counsel or by virtue of the borrower's own experience and expertise, the clause will ordinarily be enforced."). The premium serves as an approximation of the damages to the mortgagee caused by the prepayment. *Id.* at 405.

¶ 27. In this case, borrower has not challenged the method provided for calculation of the prepayment premium, or the ultimate amount. We are dealing only with the general question of whether a prepayment premium is an unreasonable restraint on alienation. We conclude that a prepayment premium does not

impose an unreasonable restraint on alienation and is generally valid.

¶ 28. We are left with the third and major ground on which borrower argues that the security agreement imposes a restraint on alienation — that is, the agreement does not allow for partial collateral substitution. The suggestion that collateral substitution must be available to avoid an unlawful restraint on alienation was apparently first raised in dicta in *Mahoney v. Furches*, 454 A.2d 1117, 1120 (Pa. Super. Ct. 1983). Although reversing the ultimate judgment, the Pennsylvania Supreme Court noted this dicta with approval on appeal. *Mahoney v. Furches*, 468 A.2d 458, 461 n.1 (Pa. 1983). The dicta was thereafter endorsed by Professor Alexander, *supra*, at 337-38 and included in the Restatement (Third) of Property: Mortgages as § 6.2(b):

> (b) Notwithstanding an agreement of the type described in (a), the mortgagor has a right to the release of the mortgage on the real estate, provided that the mortgagor gives substitute security, equal in value to the mortgage obligation and any associated fees, that is substantially the equivalent of cash. The mortgagor must pay all costs associated with the substitution. The parties may agree that security other than the substantial equivalent of cash may be substituted, but may not agree to deny to the mortgagor the right of substitution.

The comment to the subsection notes that "[t]he law's long-standing policy in favor of free alienability of land is served by this rule; even though the continued presence of the mortgage would not in most cases literally restrain alienation, it is nonetheless true that alienability is to some degree enhanced by the mortgagor's ability to make a transfer free of the mortgage." *Id.* cmt. e, at 408.

¶ 29. In essence, borrower would take the Restatement provision one step further and require partial collateral substitution, in addition to total collateral substitution, at least when a loan agreement is silent on the subject. We do not accept borrower's position. First, we note that the Restatement requirement is based on dicta in one case, and neither the Restatement, nor the dicta in the Pennsylvania case on which it is based, have ever been relied on in another appellate decision. We would be the first to adopt the Restatement and would be creating a presumption even broader than the one the Restatement details.

¶ 30. More importantly for present purposes, borrower never made a tender that met the requirements of REMIC tax law or the requirements of the security agreement. Both § 1.26(a)(ii) of the security agreement and federal tax law require that the substituted collateral be United States Government Securities. See 26 C.F.R. § 1.860G-2(a)(8)(i). Borrower instead proposed to offer escrow cash. Similarly, § 1.26(a) of the security agreement required that the amount be certified by "a nationally recognized firm of independent certified public accountants" as sufficient to provide an income stream equal to that from the mortgage; borrower supplied no such certification. Section 1.26(a) also required borrower to give at least thirty days prior written notice specifying the payment date on which the defeasance deposit would be made; this notice was not given. Although § 1.26(a) required, on the defeasance date, that borrower pay "interest accrued and unpaid on the outstanding principal amount of the Note to and including the Defeasance Election Date and the scheduled amortization payment due on such Defeasance Election Date, together with all other amounts then due and payable under the Note, this Security Interest and the other Loan Documents," borrower made no such payment, even after being in default. We need not go further with the list.

¶ 31. We recognize that borrower argues that, since the defeasance section of the security agreement applied only to total collateral substitution, borrower did not have to comply with that section for partial collateral substitution. We think, however, if we were to force partial collateral substitution on lenders, it must be on terms no less favorable than those in the security agreement, especially where necessary to protect the tax status of the REMIC trust. Borrower never complied with the collateral-substitution provision of the security agreement. Accordingly, borrower has no enforceable right to partial collateral substitution, even if we were to adopt the Restatement requirement and apply it to partial collateral substitution.

¶ 32. Borrower argues, however, that the failure to allow partial collateral substitution causes a restraint on alienation, because the mortgaged properties are mobile home parks and there are special difficulties in selling mobile home parks. Particularly, borrower cites 10 V.S.A. § 6242, which requires notice to lease-holders of an intent to sell a park and a waiting period to allow the leaseholders to make an offer. Because it would be impossible

to comply with these procedures in selling five mobile-home parks, borrower argues, a requirement of total collateral substitution is tantamount to a total prohibition on alienation.

¶ 33. We acknowledge that a mobile home park owner faces a waiting period before being able to sell a mobile home park, and we see how these difficulties could grow as an owner tries to sell more parks. Nevertheless, the waiting-period requirement is the same whether one park is sold or many. Indeed, when borrower asked to partly prepay this loan, borrower intended to sell more than one park, even if only one of the parks in question served as collateral for the REMIC loan. We do not believe that the statutory requirements — even those that give the leaseholders an opportunity to purchase the park — render sale impossible. Indeed, if we were to hold otherwise, we might make favorable REMIC loans unavailable to mobile home park owners.

## II.

¶ 34. Next, borrower contends that the superior court erred in allowing GMAC to obtain a prepayment penalty even though declaring borrower to be in default and accelerated the payment of the note. According to the notice of default and acceleration of June 23, 2003, borrower owed $799,885 as a "prepayment premium." The provision on prepayment penalties in the agreement reads as follows:

> (d) [T]he prepayment fees provided above shall be due, to the extent permitted by applicable law, under any and all circumstances where all or any portion of this Note is paid prior to the Maturity Date, whether such prepayment is voluntary or involuntary, even if such prepayment results from Lender's exercise of its rights upon Borrower's default and acceleration of the Maturity Date of this Note (irrespective of whether foreclosure proceedings have been commenced), and shall be in addition to any other sums due hereunder or under any of the other Loan Documents. No tender of a prepayment of this Note with respect to which a prepayment fee is due shall be effective unless such prepayment is accompanied by the prepayment fee.

Vermont law generally prohibits prepayment penalties or fees, 9 V.S.A. § 45, but makes an exception for prepayment penalties

imposed in obligations "to finance in whole or in part income-producing business or activity." 9 V.S.A. § 46(2). Borrower concedes that the exception applies but urges us to hold that there can be no prepayment penalty if the penalty is triggered by a lender's decision to accelerate payment.

■ ¶ 35. We acknowledge that there is some authority for borrower's claim that prepayment penalties are unreasonable if triggered by the lender's decision to accelerate. See, e.g., *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984); *Baybank Middlesex v. 1200 Beacon Props., Inc.*, 760 F. Supp. 957, 966-67 (D. Mass. 1991) (mem.). However, the majority of courts allow prepayment premiums in cases of default and acceleration if the loan agreement explicitly provides that prepayment penalties are due upon acceleration by the lender. See *Parker Plaza W. Partners v. UNUM Pension & Ins. Co.*, 941 F.2d 349, 352 (5th Cir. 1991); *Norwest Bank Minn. v. Blair Road Assocs.*, 252 F. Supp. 2d 86, 100 (D.N.J. 2003); *Feinstein v. New Bethel Missionary Baptist*, 938 So. 2d 562, 563-64 (Fla. Dist. Ct. App. 2006); *TMG Life Ins. Co. v. Ashner*, 898 P.2d 1145, 1161-62 (Kan. Ct. App. 1995); *Westmark Commercial Mortgage Fund IV v. Teenform Assocs., L.P.*, 827 A.2d 1154, 1161 (N.J. Super. Ct. App. Div. 2003). The rationale for this rule is explained in the Restatement § 6.2 cmt. c, at 407:

> Controversy has sometimes arisen concerning the collectibility of a prepayment fee when the prepayment results from the mortgagee's acceleration of the secured debt on account of the mortgagor's default. Such prepayments have occasionally been described as "involuntary." In the first instance, the question is simply whether the relevant clause in the mortgage or the debt instrument purports to cover this sort of prepayment. If it clearly does so, there is no general reason courts should refuse to enforce it. The payment may be "involuntary" in the sense that the mortgagor would prefer that the debt not be accelerated, but it is still the mortgagor's action in defaulting that triggers the acceleration. The mortgagee obviously has no duty to refrain from accelerating a defaulted loan, and the acceleration gives rise to a payment that may impose costs and risks on the mortgagee identical to those flowing from a voluntary prepay-

ment. Indeed, the mortgagee can fairly assert that the risk of prepayment resulting from default and acceleration is well within the range of risks which the mortgagee has agreed to absorb in return for the fee. Of course, in a particular instance a court might find a demand for a prepayment fee on an accelerated debt to be unconscionable or to violate the duty of good faith and fair dealing.

We find guidance from the Restatement rule as it applies to this case. See also G. Nation, *Prepayment Fees in Commercial Promissory Notes: Applicability to Payments Made Because of Acceleration*, 72 Tenn. L. Rev. 613, 644-45 (2005).

¶ 36. In doing so, we stress that we are dealing with a commercial loan made between two parties who are presumably making intelligent and calculated decisions. Borrower has no right to prepayment, except to the extent provided in the agreement and on those terms. Those terms are necessarily restricted, since REMIC loans involve the bundling of mortgages into securities that must produce a guaranteed income stream. See 4 B. Dunaway, Law of Distressed Real Estate § 56:73 (2008) ("Perhaps the greatest risk in mortgage-backed securities is the risk of prepayment."); Alexander, *supra*, at 330-31.

¶ 37. Based on the language quoted above, we conclude that the note clearly provides for a prepayment premium in cases of acceleration based on the default of the borrower. We reject borrower's argument that the note provides for the prepayment premium only where there has been payment. We do not think that borrower's construction of the language is reasonable under the circumstances. See *TMG Life Ins. Co.*, 898 P.2d at 1158. We also note that borrower has not challenged the method of calculation of the prepayment premium or the resulting amount. Thus, we are not judging whether the amount represents an unreasonable liquidated damages amount.

III.

¶ 38. We turn next to borrower's argument that the loan is void, because Column was unlicensed. Borrower argues that Column was required to be licensed by 8 V.S.A. § 2201(a)(1), because Column engaged in the business "of making loans of money" and received interest on them. Borrower alleges that Column's viola-

tion was "knowing and willful" so that the loans made during Column's violation are "void." *Id.* § 2215(c)(1).

¶ 39. Borrower first developed this argument in response to the motion to dismiss and motion for summary judgment by Column and elaborated on its theory in response to the counterclaim of GMAC. GMAC and Column responded that Column had made only two commercial loans — including the loan to borrower — and no consumer loans in Vermont while unlicensed. In any case, GMAC and Column argued, each of the two loans was greater than $1,000,000. They therefore claimed that Column did not need a license pursuant to 8 V.S.A. § 2201(c)(9), which exempts from the license requirement "lenders making only commercial loans of $1,000.000.00 or more." Borrower responded that filings to the Vermont Department of Banking, Insurance, Securities and Health Care Administration (BISHCA) showed that Column made consumer loans and commercial loans under $1,000,000 and that these loans defeated the exemption.

¶ 40. The superior court rejected borrower's argument, suggesting that it would require all lenders in the world to be licensed and regulated by the Commissioner of BISHCA, which the court characterized as an exercise of "super-regulatory powers," that could be challenged on constitutional grounds.

¶ 41. The issue of the applicability of the exemption from licensing is one of statutory construction, which we review de novo. *State v. Bonvie*, 2007 VT 82, ¶ 6, 182 Vt. 216, 936 A.2d 1291. Borrower emphasizes that the statute exempts lenders who make "only commercial loans of $1,000,000 or more." 8 V.S.A. § 2201(c)(9). Section 2201 does not state that we should consider only loans made in Vermont. Thus, borrower insists that its interpretation is supported by the plain language of the statute. Furthermore, borrower notes two examples in which the Legislature explicitly stated a geographical limitation, see 8 V.S.A. § 2200(11) (a "sales finance company" is a person who purchases one or more retail installment sales contract from "one or more retail sellers *located in this state*" (emphasis added)); § 2238 (a commercial loan made to a borrower "outside of Vermont for use outside of Vermont" is not subject to the Vermont regulatory law). Since the Legislature clearly knew how to create a geographical exception, borrower argues, the absence of an explicit geographical limitation in § 2201(c)(9) should be taken as a demonstration that the Legislature intended no such limitation. Finally, borrower

cites the legislative history of a meeting of the Senate Finance Committee in 1996, during which the Commissioner of Banking stated that the "department had difficulty dealing with licensed lenders."

¶ 42. We are more persuaded by countervailing principles of statutory construction. The first is that "a statute which uses general words is to be construed as having no extraterritorial effect, unless it clearly indicates a different intention." *Arthur A. Bishop & Co. v. Thompson*, 99 Vt. 17, 23, 130 A. 701, 703 (1925); see also *State v. Caron*, 155 Vt. 492, 513, 586 A.2d 1127, 1139 (1990) (we do not assume that "Vermont's legislature wanted to supersede the judgment of another state's legislature" with regard to regulation within the other state's borders). Moreover, like the superior court, we fail to see why the Vermont Legislature would want to regulate out-of-state lending activity by requiring a license, in instances when relevant law would not otherwise require a license. See *Fraser v. Sleeper*, 2007 VT 78, ¶ 12, 182 Vt. 206, 933 A.2d 246 ("We interpret statutes to avoid absurd and illogical results . . . in favor of reasonable construction . . . .").

¶ 43. While we appreciate borrower's statutory construction arguments, we do not think they add up to a clear indication of a different intention. The legislative history excerpt is an ambiguous statement in general testimony not specifically related to the statutory language before us. Even if the Commissioner were having difficulty with out-of-state lenders, there is no suggestion that the antidote would be to regulate out-of-state lending activity.

¶ 44. Nor does borrower's canon of statutory construction offer any help. Borrower relies on the interpretive principle expressio unius est exclusio alterius, meaning "the expression of one thing is the exclusion of another." See *In re Verburg*, 159 Vt. 161, 165, 616 A.2d 237, 239 (1992). We have repeatedly stated that "the precept [of expressio unius] is only one aid to . . . interpretation and must give way to others in appropriate cases." *Id.* at 166, 616 A.2d at 239; *Oxx v. Dep't of Taxes*, 159 Vt. 371, 375, 618 A.2d 1321, 1324 (1992) (the maxim "is relatively weak among rules of statutory construction"); *Clymer v. Webster*, 156 Vt. 614, 625, 596 A.2d 905, 912 (1991) (maxim should be applied with caution). As one federal court has observed, "[t]his maxim is increasingly considered unreliable, . . . for it stands on the faulty premise that all possible alternative or supplemental provisions

were necessarily considered and rejected by the legislative draftsmen." *Nat'l Petroleum Refiners Ass'n v. Fed. Trade Comm'n*, 482 F.2d 672, 676 (D.C. Cir. 1973) (citation omitted).

¶ 45. Under the circumstances, we agree with the trial court that consideration of out-of-state loan activity to determine whether Column should be licensed in Vermont is not a reasonable interpretation of § 2201(c)(9). Since all of Column's activity in Vermont was exempt during the period it was unlicensed, it did not violate § 2201(a), and we find no basis for imposing the penalties described in § 2215(c).

IV.

¶ 46. This brings us to borrower's final claim — that GMAC breached its implied covenant of good faith and fair dealing. To carry its burden for the good-faith-and-fair-dealing claim, borrower must produce evidence that could lead a reasonable jury to conclude that GMAC "breached an implied-in-law promise not to do anything to undermine or destroy [borrower's] rights to receive the benefit of the parties' . . . agreement." *Monahan v. GMAC Mortgage Corp.*, 2005 VT 110, ¶ 3, 179 Vt. 167, 893 A.2d 298. The covenant of good faith and fair dealing is implied in every contract; its boundaries, however, are contextual and fact-specific. *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993). The covenant "is an implied promise that protects against conduct [that] violates community standards of decency, fairness or reasonableness." *Harsch Props., Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 182 Vt. 196, 932 A.2d 1045. Good faith is ordinarily a question of fact. *Monahan*, 2005 VT 110, ¶ 50. However, plaintiff must provide a basis on which the fact finder can find a violation. See *Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 12, 175 Vt. 413, 834 A.2d 37.

¶ 47. Borrower points to several facts that could support an inference of bad faith, including lenders' refusal to provide a statutory payoff figure as required by 27 V.S.A. § 464, lenders' insistence on maintaining a security interest in Eastwood when offered sale proceeds in excess of Eastwood's internal valuation, and lenders' reversal of position on borrower's ability to release Eastwood months after the sale deadline for Eastwood passed. Borrower also stresses that lenders accelerated payment of the

loan in retaliation for borrower's initiating suit. Finally, borrower emphasizes that lenders insisted on continuing the foreclosure action even after borrower tendered deeds on all five properties covered by the loan, even admitting "the existence of an improper ulterior motive for prolonging the litigation."

¶ 48. We dispose of all but one of borrower's claims summarily. The last two issues involve actions taken after the summary judgment decision on appeal. Thus, neither of these claims was made to the trial court. This Court will not consider matters raised for the first time on appeal. *Agency of Natural Res. v. United States Fire Ins. Co.*, 173 Vt. 302, 311, 796 A.2d 476, 482 (2001).

¶ 49. We also summarily reject the claim that lenders did not act in good faith by refusing collateral substitution when it was proposed without compliance with the terms in the security agreement. As we have held above, lenders were fully within their rights in declining to allow partial collateral substitution. Their action cannot be considered bad faith.

¶ 50. We have a similar reaction to lenders' eventual offer of partial collateral substitution as a settlement of this litigation. Borrower's main response to this offer is that it came too late to allow the sale of the Eastwood property pursuant to borrower's contract. The timing of the sale of Eastwood, however, was entirely controlled by borrower, and borrower contacted lenders only after it signed the contract of sale. Borrower acted as if it was oblivious to the special terms of the REMIC loan. Because of the possible tax consequences for shareholders, REMIC loans require extensive time and cost to work out whether and how collateral substitution is allowed. See *supra*, ¶ 2. Most importantly, borrower is complaining about an unaccepted settlement proposal. This proposal clearly involves a waiver of borrower's contractual responsibilities and GMAC's contractual rights. If lenders acted within their rights to refuse partial collateral substitution, we do not see how it can be bad faith to offer a settlement that waives those rights in return for termination of the litigation and other considerations. The unaccepted settlement proposal may show that GMAC could have waived its rights earlier, but in no sense demonstrates that GMAC had any obligation to do so.

¶ 51. Finally, we summarily reject borrower's argument that lenders acted in bad faith by failing to provide a required

statutory payoff figure. Borrower's argument that it was entitled to a payoff figure is based on 27 V.S.A. § 464(a), which provides in pertinent part: "[w]ithin five business days after the mortgagee's receipt of a written request for a statement of the amount of funds or other obligations required to satisfy a note or other obligation secured by a mortgage, the mortgagee shall provide a written payoff statement to the mortgagor." In support of its argument, borrower points to two letters it sent to lender, the first of which came from borrower's president in February of 2003 and requested "a release/payoff amount with a per diem for the Eastwood Mobile Home Park." The second letter came from borrower's lawyer on May 11, 2003 and requested "a written payoff statement on the above-referenced loan pursuant to 27 V.S.A. sec. 464 within five business days."

¶ 52. Although mentioning the statute in response to lenders' motion for summary judgment, borrower did not identify breach of the statute as part of its claim that lenders violated the covenant of good faith and fair dealing. Nor did it plead breach of the statute in either its original complaint or its answer and affirmative defenses to lenders' counterclaim. As a result, the superior court never addressed the argument, either as an independent claim that lenders violated the statute or as part of the claim that lenders violated the covenant. Because borrower failed to raise this claim below, we do not consider it here. See *In re Entergy Nuclear Vt. Yankee, LLC*, 2007 VT 103, ¶ 10, 182 Vt. 340, 939 A.2d 504.

¶ 53. Borrower's main bad-faith claim is that lender began foreclosure proceedings in retaliation against borrower for commencing litigation on the loan agreement. The trial court concluded that the timing of foreclosure proceedings is insufficient alone to show bad faith. In making this ruling, Judge Toor explained:

> GMAC did not induce R&G's default, and did not mislead R&G regarding the defeasance terms. GMAC had no obligation to amend the terms of the note merely because R&G considered amendment desirable, and GMAC was free to seek foreclosure following default. Foreclosure is not retaliatory because R&G filed its lawsuit first.

We reiterate that, to make out a bad-faith claim, borrower must produce evidence that could lead a reasonable jury to conclude that any lender "breached an implied-in-law promise not to do anything to undermine or destroy [borrower's] rights to receive the benefit of the parties' . . . agreement." *Monahan*, 2005 VT 110, ¶ 3.

¶ 54. Borrower emphasizes the timing of lenders' foreclosure action. For the purposes of establishing a prima facie wrongful-termination claim, "plaintiff may establish a link indirectly by showing that the timing of the complaint and the retaliatory action was suspect." *Gallipo v. City of Rutland*, 163 Vt. 83; 93, 656 A.2d 635, 642 (1994). By contrast, we have not addressed the relevance of timing for the purposes of loan foreclosure cases. In *Monahan*, we addressed a bad-faith claim brought by a borrower after the lender initiated foreclosure proceedings necessary in part because the lender's breach of the agreement had rendered borrower unable to pay. We stated that, for the purposes of bad-faith analysis, it was necessary to consider evidence of the lender's intent and that "[d]iscerning . . . true intention is a question of fact for the jury." 2005 VT 110, ¶ 46.

¶ 55. The record shows that borrower has merely alleged bad faith while presenting no factual evidence to show that "the foreclosure was [anything] more than standard procedure in a case of mortgagor default." *Id.* ¶ 47. To survive summary judgment, however, borrower must show that there are remaining issues of material fact. *Collins*, 2007 VT 92, ¶ 6. The party opposing summary judgment may not simply rest upon "mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." V.R.C.P. 56(e).

¶ 56. *Monahan* does not govern this case, because that decision is distinguishable. In that case, the lender breached first, preventing the borrower from obtaining rental income and ultimately triggering a default. The timing of the suit was not the dispositive factor. Nor do we see any reason to emphasize the timing of foreclosure proceedings here. Borrower defaulted by nonpayment on a loan in excess of $2 million. Lenders did not cause this default but merely justifiably insisted on the enforcement of their rights under the loan and security contracts. The notice of default and acceleration, sent approximately six weeks

after borrower commenced litigation against lenders, is based solely upon nonpayment of monthly installments. Over six months after borrower brought its action against lenders, lender filed a counterclaim for the accelerated amount under the note. In January 2004, eight months after borrower brought suit, lender brought its mortgage foreclosure action. There is no direct evidence that lender declared the default, filed its counterclaim, and filed its mortgage foreclosure action in retaliation for borrower's suit. The only indirect evidence is the timing, and that evidence cannot sustain an allegation of bad faith.

*Affirmed.*